284 P.2d 681

PETITION of the MOUNTAIN STATES TELEPHONE and TELEGRAPH COMPANY, a Corporation, for a Hearing to Consider Certain Substantial Changes in Expenses.

No. 8194.

Supreme Court of Idaho.

April 15, 1955.

Rehearing Denied June 16, 1955.

476

Carey H. Nixon, Boise, and J. H. Shepherd, Denver, Colo., for appellant.

Graydon W. Smith, Atty. Gen., J. N. Leggat, and Edward J. Aschenbrener, Asst. Attys. Gen., for respondents.

Gregg R. Potvin, American Falls, Ben B. Johnson, Preston, Grant L. Ambrose, Meridian, Lloyd D. Browning, Pocatello, and Harold Ryan, Weiser, for protestants.

On Rehearing (Respondent's Petition)

TAYLOR, Chief Justice.

Subsequent to the first opinion filed December 22, 1954, rehearing was had on March 7, 1955. The first opinion is withdrawn and the following substituted.

After having been granted four rate increases subsequent to November 14, 1946, the appellant filed this, its fifth application for further increases, May 17, 1952. The application is based upon alleged increased costs in wages, materials, and taxes, and upon improved and added plant and equipment.

Hearings were had on and subsequent to September 3, 1952, culminating in an order on May 15, 1953, denying the application.

A rehearing was granted and after further hearing order No. 2644 was entered May 14, 1954, likewise denying any increase.

The company appealed from both orders and the state appealed from the portion of order No. 2644 allowing the sum of $467,-164 for materials and supplies as a part of the company's rate base.

The state accepted the company's statement of the value of its total Idaho plant in service, $33,426,056, but took issue with the company as to the portion thereof which should be separated from the total and allocated to its intrastate rate base. The state also took issue with items which the company contends should be added to the rate base, that is, plant under construction, property held for future use, materials and supplies and cash working capital. The issue as to separation also involved the amount of the company's depreciation reserve, which should be allocated to and deducted from its intrastate rate base.

The principal difference between the parties continues to be as to procedures and methods necessary to a reasonable and just separation of the properties, expenses, and depreciation reserve, in arriving at the proper portion thereof to be allocated to the intrastate rate base. The company continues to urge that the Separation Manual, as amended or modified by the so-called Charleston Plan, must be accepted and applied by the commission because it is the most authoritative and widely accepted plan of separations available. The commission contends that it is not bound to accept the manual, that it is not accurate, and is weighted against intrastate rates. The Separations Manual is a document containing standard procedures for separating telephone properties, revenues and expenses, adopted by the National Association of Railroad and Utilities Commissioners, and the Federal Communications Commission, October, 1947, and the addendum covering changes therein adopted in October, 1951, at Charleston, S. C.

In approaching the subject we are mindful of the limitations upon the scope of our review in such cases. Our constitution provides jurisdiction in this court to review upon appeal any order of the Public Utilities Commission, but it also says "the legislature may provide conditions of appeal, scope of appeal, and procedure on appeal from orders of the public utilities commission * * *." Const. Art. 5, § 9. Pursuant to such authority, the legislature has defined the scope of appeal as follows:

"No new or additional evidence may be introduced in the Supreme Court, but the appeal shall be heard on the record of the commission as certified by it. The review on appeal shall not be extended further than to determine whether the commission has regularly

pursued its authority, including a determination of whether the order appealed from violates any right of the appellant under the constitution of the United States or of the state of Idaho. Upon the hearing the Supreme Court shall enter judgment, either affirming or setting aside the order of the commission. * * * " § 61–629, I.C.

■ The function of rate making is legislative and not judicial. The commission as the agency of the legislative department of government exercises delegated legislative power to make rates. So long as it regularly pursues its authority and remains within constitutional limitations, the courts have no jurisdiction to interfere with its determinations.

■ "It is fundamental that the judicial power to declare legislative action invalid upon constitutional grounds is to be exercised only in clear cases. The constitutional invalidity must be manifest, and if it rests upon disputed questions of fact, the invalidating facts must be proved." Los Angeles Gas & Electric Corp. v. Railroad Commission, 289 U.S. 287, 53 S.Ct. 637, 645, 77 L.Ed. 1180, at page 1194.

■ "We do not sit as a board of revision, but to enforce constitutional rights. San Diego Land & Town Co. v. Jasper, 189 U.S. 439, 446, 23 S.Ct. 571, 47 L.Ed. 892 [896]. The legislative discretion implied in the rate-making power necessarily extends to the entire legislative process, embracing the method used in reaching the legislative determination as well as that determination itself. We are not concerned with either, so long as constitutional limitations are not transgressed. When the legislative method is disclosed, it may have a definite bearing upon the validity of the result reached, but the judicial function does not go beyond the decision of the constitutional question. That question is whether the rates as fixed are confiscatory. And upon that question the complainant has the burden of proof, and the court may not interfere with the exercise of the state's authority unless confiscation is clearly established." Los Angeles Gas & Electric Corp. v. Railroad Commission, 289 U.S. 287, 53 S.Ct. 637, 643, 77 L.Ed. 1180, at page 1192.

■■ "It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And

he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 288, 88 L.Ed. 333, at page 345.

The desirability of a uniform method of effecting a separation of properties and expenses of a telephone company engaged in both interstate and intrastate transactions is perfectly obvious, and no doubt the Separations Manual with the Charleston amendments is a good start to that end. However, it is generally recognized that the goal has not been attained and that further studies and determinations are necessary to effect methods and procedures which will result in reasonable and just separations equitable to both the utility and to the user, interstate and intrastate. Before the Charleston modifications were made it was recognized that the Separations Manual was weighted against the intrastate use.

"There can be no doubt that the application of the use method as prescribed in the Manual has discriminated against users of the intrastate services. In the postwar rate cases, the Bell companies have generally demonstrated that they are entitled to an increase in rates in *some* amount. They have shown that their costs of operation have increased substantially. Since this is true of *all* their costs, it seems that interstate rates as well as intrastate rates should be raised. Yet no application has been made by any Bell Company, including the Long Lines Department, for higher interstate rates. On the contrary, the Federal Communications Commission has recently declared that earnings of the Long Lines Department are excessive and has initiated proceedings with the view to reducing interstate toll rates. Presumably the Federal Commission has based its calculations on the separation formula of the Manual for the Commission has been an influential advocate of its adoption. Since interstate rates have been reduced on several occasions after the inception of the Commission in 1934, once as recently as 1946, the inference is inescapable that application of the Separations Manual results in the allocation of a disproportionate share of property and expenses to intrastate operation." The Bell Telephone System Rate Cases, by Joseph R. Rose, Virginia Law Review 699, at 730 and 731.

■ It was in response to such criticism and protests from state commissions that the Federal Communications Commission suggested the Charleston amendments to meet the objection that the plan was inequitable and resulted in toll rates that were higher for intrastate messages than for interstate communications. Thus the so-

called Charleston plan was proposed and adopted to correct admitted defects resulting in divisions which were unfair to intrastate users. The remedy, however, did not fully correct the inequities. The disparity between toll rates, interstate and intrastate, continues, and unexplained, is the most telling argument against the application of the plan by the state commission.

"The development by our commission of their own separations manual is almost a practical impossibility at this time. Therefore, the commission must accept in substance the separation formulas handed them by the telephone company. We mention this only because the consensus of opinion is to the effect that the formulas of the manual are unfair to the intrastate units. As one example of this, it is generally true that the earnings on interstate toll have shown a higher rate of return than has intrastate toll. Moreover, the history of state commissions in recent years has shown a continual application for and granting of increases in intrastate rates, whereas, at least until recently, the Federal Communications Commission was considering a lowering of rates on an interstate basis. This situation becomes more understandable when we disregard the corporate fiction and recognize that American Tel. & Tel., the parent corporation, owns the majority of the stock of the operating company and has, as one part of its own organization the profitable long lines department. Simply stated, the result would be increased earnings to the parent corporation by having the subsidiary intrastate units carry more than their fair share of the expense of interstate operations. We cannot ask our commission now to investigate with particularity this phase of the question. Indeed, our commission has no power to require production of the books and figures of the parent corporation; nevertheless, this Court may consider the weight of informed judgment that, in this area, the intrastate figures produced by the company are weighted in favor of higher rates." State Corporation Commission v. Mountain States Tel. & Tel. Co., 58 N.M. 260, 270 P.2d 685, at page 699.

See also, Bell Tel. Co. v. Public Service Commission, Nev., 253 P.2d 602; Re S. W. Bell Tel. Co. (Houston City Council) 2 PUR 3rd 265; New England Tel. & Tel. Co. v. State, 98 N.H. 211, 97 A.2d 213; Re New England Tel. & Tel. Co. (N.H., P.U.C.) 97 PUR (N.S.) 410.

The company argues that refusal to accept the manual results in a portion of its property and expenses being unrecognized by either the federal or state regulatory authorities and omitted by both from their respective rate bases, will result in denial to it of a return upon such property. Assuming that to be the case, it is equally ap-

parent that, if the state commission has arrived at a reasonable and just separation of the property and expenses, and has allowed a fair return upon the resulting intrastate base, confiscation, if any follows, must be charged to the action of the federal agency.

■ It was entirely within the province of the commission to determine whether the procedures provided by the manual would result in a reasonable and just rate base and, therefore, whether or not it would follow those procedures. The commission having rejected the plan, we are concerned only as to whether the method adopted by the commission was within its authority and whether the conclusion it reached is shown to be confiscatory. For the most part the commission had before it for consideration only figures, tabulations and calculations produced by the company. Exhibit 79 is a tabulation of the number of interstate messages, originating through certain exchanges within the state, through the months of August, 1952, to July, 1953. This tabulation shows a greater volume of such originating calls in August, 1952, followed closely by the number for July, 1953.

■ Appellant complains that in arriving at the percentage which is used to determine the allocations of total Idaho property to intrastate use, it used the peak period of August, 1952, in determining the interstate use, and that it should have accepted an average of the twelve month period covered by the exhibit, and that the commission's action was thus arbitrary and unreasonable. The state urges that since the evidence before the commission shows that the investment in facilities to handle interstate business was required to be, and is, sufficient to handle the peak load, any failure to allocate to interstate use the property devoted to interstate business on the basis of its full capacity, would result in taking the idle portion of appellant's interstate property out of the interstate rate base and putting it into the intrastate base, where it does not belong and where it adds an unjust burden to the intrastate user. Such a conclusion may not be entirely accurate, since, theoretically at least, the company might be able to reduce the operating expense during low periods of intrastate use. However, we cannot say that the commission acted arbitrarily or that its action was unreasonable; nor can we say that it ignored other factors such as distance and minutes of use, because other exhibits also prepared by the company were in evidence containing information as to those factors, and, although they contain allocations computed upon the separations formula urged by the company, they furnished a basis for computations by the commission upon the percentage of allocation which it determined upon. For example, Exhibit 80, which contains a tabulation by the company of its allocation to interstate use, by categories according to the Manual, shows under category A, "Exchange Outside Plant & Sta. Equipment", "Total Call Min-

utes of Use", a peaking in June, 1953, with May, 1953, second, and August, 1952, third. Category B, as to "Dial Equipment Minutes of Use", the peaking occurs in August, 1952. In category C, covering switching equipment "Traffic Units", the peaking occurs in August, 1952. Under "Interexchange Toll Lines, Outside Plant", "Conversation Minute Miles or Direct Assignment", the peaking also occurs in August, 1952. Under "Toll Terminal Facilities" "Conversation Minute Miles or Direct Assignment", the peaking occurs in December, 1952. Under "Intertoll Dial Facilities" "Minutes of Use", the peaking occurs in October, 1952. Exhibit 81 contains a tabulation by the company of its allocation of expenses and taxes to its interstate business for the same twelve month period. This exhibit shows a peaking of expenses in July, 1953, with August, 1952, second, and October, 1952, third. So that the company's figures as to expense do not show a rise and fall coincident with the volume of interstate business. Exhibit 83, also by the company, contains computed percentages of interstate traffic: Category A, "% Interstate Minutes of Use to Total Call Minutes of Use"; Category B, "% Interstate Dial Equipment Min. to Total Dial Equipment Min. of Use"; and "% Interstate Units to Total Traffic Units". (This latter covers four principal exchanges.) In all of these categories the interstate business also shows a peaking in August, 1952. These exhibits support the commission in calculating its separations percentages upon the volume and use factors having their peak allocable to interstate in August, 1952. These tabulations include incoming as well as originating messages. They also show the commission did not act on number of calls alone. Minute miles and other factors were also considered. Moreover, its use of the peak period of interstate business finds support by other courts and commissions. New England Tel. & Tel. Co. v. State, 1953, 98 N.H. 211, 97 A.2d 213; Arkansas Louisiana Gas Co. v. City of Texarkana, 8 Cir., 96 F.2d 179; Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206.

The commission arrived at the percentage basis of its allocation to intrastate by computing the total Idaho investment for August, 1952, from the total given by the company at the end of 1951, and projecting that figure to the end of August, 1952, by adding thereto at the existing rate of expansion. Then accepting the company's allocation of $7,222,972 thereof to interstate use for August, 1952, (Ex. 80) the commission found the interstate portion of the total Idaho plant to be 24.79%, and the intrastate portion 75.21%. It is to be noted that while the allocation to interstate made by the company for August, 1952, is higher than the average for the twelve month period, it is not the highest month, being exceeded by December, 1952, with $7,248,793. Again accepting the company's valuation of its total Idaho plant in service July 31, 1953, the commission applied this same ratio of

75.21% in arriving at the intrastate investment.

To the investment thus derived, the commission added under "property held for future use" two items (both calculated upon a higher separation rate) in full as requested by the company. The commission also added $467,164 for "materials and supplies", as computed by the company on a separation rate of 81.94% intrastate. The company allocated the deduction for depreciation reserve on the basis of 74.36% intrastate, while allocating all other items charged to intrastate at a higher rate. The commission applied its own ratio of 75.21% to the company's depreciation reserve and deducted the result from the intrastate investment. The same separation ratio was applied by the commission to the company's total Idaho expenses, to determine net intrastate revenue.

Neither the appellant nor the commission made any allocation of interstate revenues to intrastate business. Separations were confined entirely to property, expenses, and reserve. The company's showing as to intrastate revenue was accepted by the commission.

■ The commission disallowed the company's allocation of $433,380 for working capital. In view of the practice of advance billing for exchange service, an average monthly balance of $14,000,000 in its tax accrual account, its access to the parent company's loan account pool, and the full allowance of its requirement for materials and supplies, the commission's action does not appear arbitrary or unreasonable. It is a matter of discretion for the commission, not of law for the court. Chesapeake & Potomac Tel. Co. v. Public Service Commission, 1952, 201 Md. 170, 93 A.2d 249; City of Cincinnati v. Public Utilities Commission, 161 Ohio St. 395, 119 N.E.2d 619; Michigan Bell Telephone Co. v. Michigan Public Service Commission, 1952, 332 Mich. 7, 50 N.W.2d 826; Re New Eng. Tel. & Tel. Co. (N.H., P.U.C.) 97 PUR, N.S., 410; Re Pacific Tel. & Tel. Co. (Ore.P.U.C.1953) 1 PUR 3rd 1; Re Mt. States Tel. & Tel. Co. (Utah P.S.C.1953) 2 PUR 3rd 75; Re S. W. Bell Tel. Co. (Houston City Council) 2 PUR 3rd 265; Re So. Nevada Tel. Co. (Nev.P.S.C.) 2 PUR 3rd 342.

■ The commission disallowed "plant under construction". This appears to be a question of policy wholly committed to judgment and discretion of the commission. It is a legislative function to determine whether such item should be presently admitted to the rate base, and an attempt made to forecast and adjust future rates to avoid a double burden on the rate-payer, or to disallow it until it is placed in use. The commission regularly pursued its authority and is supported by authority. Re New England Tel. & Tel. Co. (N.H., P.U.C.) 97 PUR, N.S., 410; Re Mt. States Tel. & Tel. Co. (Utah P.S.C.1953) 2 PUR 3rd 75; Re So. Nevada Tel. Co. (Nev.P.S.C.) 2 PUR 3rd 342.

Accepting the company's figures, the commission found the company's capital structure to be 30.8% debt and 69.2% equity, and actual interest cost of debt 2.95%. The company's request includes $8 per share dividend, and 32% retained earnings. From 1938 to 1942, the company paid a $7 dividend, per share $100 par. It has since paid around $6, and recently increased it to $6.60. Its retained earnings have been approximately 10%. During the past several years these dividends and retentions have compared favorably with those of the parent company, American Tel. & Tel. Co. From 1946 to 1953, the company has increased its outstanding capital stock from $57,564,300 to $194,899,500, and the percentage thereof owned by the parent company has increased from 73% to 86%.

For the purpose of comparison, the company presented an exhibit (No. 65) showing dividend and available earnings of thirteen electric utilities having higher rates of return than the company. The commission found the average debt ratio in the capital structure of the electric utilities was 66.66%, compared to the company's 30.8%.

■ The commission made a computation of the earnings which would be required to finance the capital structure of the company upon the assumption of a structure of 45% debt and 55% equity, with 3¼% interest allowed on debt, and $7 per share dividend, and based upon a pay-out of 90% of earnings. Using the percentage of its total annual earnings, which the company says is the portion required from its Idaho operation, the commission determined that the company's required net earnings from its Idaho operations is $1,247,691, compared to the company's claim for $1,976,000. The commission's computation would also allow for the company as a whole, $1,205,262 annually available for surplus, compared to an increase in surplus of $2,833,803 during the years 1946 to 1952.

At a time when federal income taxes require 52% of net earnings, and the company's current expansion program involves what is possibly a peak or a high plateau in the cost of labor and materials, the commission was warranted in its consideration of the company's capital structure. Its action was not arbitrary or unreasonable, and is supported by precedent. State Corp. Commission v. Mountain States Tel. & Tel. Co., 58 N.M. 260, 270 P.2d 685; New England Tel. & Tel. v. Department of Public Utilities, 1950, 327 Mass. 81, 97 N.E.2d 509; Chesapeake & Potomac Tel. Co. v. Public Service Commission, 1952, 201 Md. 170, 93 A.2d 249; New England Tel. & Tel. Co. v. State, 1953, 98 N.H. 211, 97 A.2d 213; Re New England Tel. & Tel. Co. (N.H., P.U.C.) 97 PUR, N.S., 410; Re Mt. States Tel. & Tel. Co. (Utah P.S.C.1953) 2 PUR 3rd 75; Re S. W. Bell Tel. Co. (Houston City Council) 2 PUR 3rd 265.

Although it based no specific action thereon, the commission, with some measure of justification, criticised the pension

policy of the company, particularly as to the amount involved in the higher brackets, and that its system provides for no employee contribution to the fund.

The final order will allow a return at existing rates, based upon a capital structure which the commission found to be reasonable, of 5.71% upon the company's intrastate investment. Considering the burden of proof, which appellant bears in these proceedings, and the state of this record, we cannot say that the return allowed is confiscatory. Utah Power & Light Co. v. Public Service Commission, 107 Utah 155, 152 P.2d 542; State Corp. Commission v. Mountain States Tel. & Tel. Co., 58 N.M. 260, 270 P.2d 685; Michigan Bell Tel. Co. v. Michigan Public Service Commission, 1952, 332 Mich. 7, 50 N.W.2d 826; Arkansas Louisiana Gas. Co. v. City of Texarkana, 8 Cir., 96 F.2d 179; Chesapeake & Potomac Tel. Co. v. Public Service Commission, 1952, 201 Md. 170, 93 A.2d 249; New England Tel. & Tel. Co. v. State, 1953, 98 N.H. 211, 97 A.2d 213; Smith v. Ill. Bell Tel. Co., 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255; Federal Power Commission v. Natural Gas Pipeline, 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037; Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333; Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206; Re New England Tel. & Tel. Co. (N.H., P.U.C.) 97 PUR, N.S., 410; Re Pa-

cific Tel. & Tel. Co. (Ore.P.U.C.1953) 1 PUR 3rd 1; Re Mt. States Tel. & Tel. Co. (Utah P.S.C.1953) 2 PUR 3rd 75; Re S. W. Bell Tel. Co. (Houston City Council) 2 PUR 3rd 265; Re So. Nevada Tel. Co. (Nev.P.S.C.) 2 PUR 3rd 342.

A full hearing and rehearing was had by all parties before the commission. A voluminous record of evidence, both oral and documentary, was made, and it appears that the commission has given consideration to all of the important relevant elements therein.

"Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances. Once a fair hearing has been given, proper findings made and other statutory requirements satisfied, the courts cannot intervene in the absence of a clear showing that the limits of due process have been overstepped. If the Commission's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result, our inquiry is at an end." Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 62 S. Ct. 736, 743, 86 L.Ed. 1037, at page 1050.

We conclude that the commission has regularly pursued its authority, and that

488

its conclusion is not shown to be violative of any constitutional right of the appellant.

The orders are affirmed.

Costs to respondent.

KEETON, PORTER, ANDERSON and SMITH, JJ., concur.

On Appellant's Petition for Rehearing

Appellant urges two grounds for rehearing. First it charges errors in the calculations of the commission as follows:

"A. * * * It is indisputable from the first paragraph on page 14 of Order No. 2644 that the Commission reduced the expenses assignable to intrastate operations by $464,775, and added that full amount to the intrastate net operating earnings. By overlooking the unavoidable resulting increase in income taxes, the Commission overstates the intrastate net earnings by about $220,-000, and thereby improves the rate of return by 1.04%. Correction of this error alone reduces the rate of return to 4.67%, instead of the 5.71% which this Court had in mind in its opinion of April 15, 1955. * * *

"B. Another error, not so large in amount but still having an important effect on the result, comes about by the failure of the Commission to exclude 'Interest Charged Construction' from its computation of net earnings. All accounting and regulatory authorities agree that the income of 'Interest Charged Construction' and the rate base item of 'Telephone Plant Under Construction' must be treated as complementary items. When 'Telephone Plant Under Construction' is excluded from the rate base, as the Commission has done, then 'Interest Charged Construction' must be excluded as an income item. The inconsistency in the treatment of these two items results in the overstatement of net earnings by $32,852."

It is undoubtedly true that any increase in net earnings will result in an increase in income taxes. And with the federal income tax at the confiscatory rate of 52%, for at least another year, 26 U.S.C.A. § 11(a), the item is an important one. We note, however, a credit of 4% against income tax is allowed to stockholders, which should in some measure improve the company's financial position, 26 U.S.C.A. § 34. It is also to be observed that appellant, bearing the burden in these proceedings, has not shown how it arrived at the amount of $220,000, overstatement of earnings.

The company's position with respect to the other error appears to be correct. "Plant Under Construction", having been eliminated from the rate base, interest chargeable to such construction should not be included in earnings.

■ However, we cannot say that these items were entirely overlooked by the Commission because, as noted in the foregoing opinion, there are certain compensating items which the Commission found and allowed in appellant's favor. Moreover, the Commission specifically mentioned the amount of company's state and federal income taxes for the year ending July 31, 1953, and found "A reduction of that amount could have been accomplished with a more realistic debt-equity ratio of the company's capital structure." We think also that these items could be more than offset by management in certain policy changes; citing, as an illustration only, the company's non-participating employee pension system. A small contribution by the employees to the pension fund would be economically more sound, and in the interests of both the parties and the public. More particularly criticised by the Commission was the refusal of the parent company (appellant's controlling stockholder) to limit pension payments to its retiring personnel to $25,000 per year, per person.

■ The second ground for rehearing urged is that the company was denied a fair hearing by the adoption of a method of separations differing from the standard method approved by the National Association of Railroad and Utility Commissioners and the Federal Communications Commission. The company complains that it has been afforded no opportunity to meet and rebut the separations formula adopted by the commission. We find no merit in this contention. This cause was heard and re-heard by the Commission over a period of nearly two years. All parties were afforded an opportunity to be heard fully. And on this appeal it has been twice presented and considered.

Interest rates being at low ebb, and stocks and bonds still in a long and apparently sound climb, the point at which confiscation begins would be lower now than in some years past. Considering the record and all of the considerations which appellant has urged upon us, we cannot say that it has met the burden of showing confiscation, or that the commission did not regularly pursue its authority.

The petition for rehearing is denied.

KEETON and ANDERSON, JJ., concur.

PORTER, Justice (dissenting).

It appears from the record that the commission reduced the expenses assignable to intrastate operations by $464,775 and added that full amount to the intrastate net operating earnings. It is not denied by respondent or in the majority opinion on Petiton for Rehearing that the resulting increase in federal income taxes was not included in the calculations of the commission. Appellant computes the resulting amount of overstatement of net earnings as about $220,000.

The majority opinion recognizes that it was error for the commission to fail to

490

exclude from net earnings the item of "Interest Charged Construction" and that net earnings were thereby overstated by the sum of $32,752.

I would remand the cause to the commission with instructions to consider the foregoing items in its calculations and resulting order.

SMITH, J., concures in the above dissent.