In the Matter of the CITY OF NEW YORK et al., Petitioners, v. PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK et al., Respondents.

Third Department, February 8, 1963.

Leo A. Larkin, Corporation Counsel (Samuel Mandell and Francis I. Howley of counsel), for City of New York, petitioner.

Hays, Sklar & Herzberg (Ben Herzberg, Renee Schwartz and Edward Klagsbrun of counsel), for New York City Housing Authority, petitioner.

Poletti, Freidin, Prashker & Harnett (Charles Poletti and Herbert Prashker of counsel), for Chesebrough Building Company and others, petitioners.

Kent H. Brown, Joseph J. Doran, George H. Kenny, Norman Abell and Martin L. Barr for Public Service Commission, respondent.

Whitman, Ransom & Coulson (Colley E. Williams, Patrick H. Sullivan and Bernard L. Sanoff of counsel), for Consolidated Edison Company of New York, Inc., respondent.

Per Curiam. Petitioners challenge orders of the Public Service Commission made November 14 and December 12, 1961 and January 17, 1962 allowing the Consolidated Edison Company increased revenues for electric service and allocating the burden among certain classes of consumers.

All of the petitioners except the City of New York are large consumers of electricity who have been substantially and adversely affected by the impact of the increased rates. The City of New York is a petitioner in its representative capacity in pursuance of section 108 of the Public Service Law on behalf of the residents of the city generally.

Petitioner New York City Housing Authority is the largest single consumer of electricity on tariff rates of this utility and

the third largest in total utilization of electricity. It estimates that under the increases allowed its electric bill will be $6,700,000 annually.

The decision of the commission may be summarized by saying that the utility was allowed an annual increase of rates of approximately $26,000,000, more than half of which ($15,700,000) was reflected in a temporary interim determination on January 12, 1960 and the rest ($10,400,000) in the final orders. The entire scope of the orders is here reviewed.

In the final orders decreases in rates for some groups of consumers were effected in the amount of approximately $11,000,000 while others (largely those of consumer petitioners) were further increased approximately $21,400,000 to reach the net increase of $10,400,000 which the final order added to the temporary interim order of $15,700,000 to approximate $26,000,000. We have heretofore denied a stay during the pendency of this review proceeding (16 A D 2d 1015, affd. 12 N Y 2d 786).

The attack on the validity of the final determination by the commission is laid on a broad front. It is said that the allowed rate of return of 6½% is excessive and made without sufficient factual findings; that the rate base was inflated and overstated; that the return earned for the test year (1959) by the utility was understated; that adequate deductions for revenue deficiencies arising from special contracts for electric services were not made; that the distribution of the revenue burden and its impact on consumer petitioners was arbitrary and unjust. Petitioners also complain of rulings on evidence.

We look first to the scope of review in this court. The right of petitioners to challenge the decisions of the commission in this proceeding is not open to doubt. Nothing said or decided in *Matter of Campo Corp.* v. *Feinberg* (279 App. Div. 302, affd. 303 N. Y. 995) suggests any infirmity in the right of a consumer whose utility bills are increased by a ruling of the commission to review in an article 78 procedure the effect on him of the higher rates. The City of New York has this right in a representative capacity pursuant to express provisions of statute (Public Service Law, § 108).

Since the commission must " determine and prescribe " both rates and classifications that are " just and reasonable " (Public Service Law, § 66, subd. 5) it must be clear that a consumer such as the petitioner Housing Authority whose annual charges for electricity as a result of the orders here reviewed are imputed to have increased by $1,200,000 a year is firmly and properly in court with a right to challenge the legality of the orders.

Insofar as article 78 allows a review, the right of a utility claiming an insufficient rate, or even confiscation, and the right of a consumer claiming an excessive rate are not essentially different.

Nevertheless our power is narrow in scope. We may interfere " only for erroneous determination of a question of law " (*People ex rel. Consolidated Water Co.* v. *Maltbie,* 275 N. Y. 357, 366). "The business of rate making has been confided by the legislature to a body of experts with powers of inquiry and modification adequate to the task" (CARDOZO, J., in *City of Rochester* v. *Rochester Gas & Elec. Corp.,* 233 N. Y. 39, 49).

It was there noted in sweeping terms that the courts will not interfere with the commission's judgment and discretion " except to safeguard the consumer against arbitrary power " (p. 49).

We look then to see, not whether the commission has made a determination wholly free from error in the process, or quite in accord with a judicial view of how the procedure before the commission should be managed in detail, but to the " total effect " of the rate order in relation to what is just and reasonable (*Power Comm.* v. *Hope Gas Co.,* 320 U. S. 591, 602).

A somewhat similar view was expressed in this court six years before *Hope* in *Matter of Long Is. Light. Co.* v. *Maltbie* (249 App. Div. 918, 919). Despite some errors found in the proceeding it was held the rates were sufficiently grounded in the record. We noted that "It is only the ultimate result which counts."

The essential test of such a review as this is that the determination shall have a reasonable basis (*Matter of Fink* v. *Cole,* 1 N Y 2d 48, 53) which, in a rate case, must be read with the statute to mean that there is reasonable basis for finding the rates in question to be " just and reasonable ".

Examining the temporary rates which have become integrated in the final order now here, we have heretofore held them sufficiently supported by the proof before the commission (*Matter of Sixty Wall Tower Co.* v. *Public Serv. Comm.,* 12 A D 2d 853, affd. 10 N Y 2d 861), but the scope of the present review is not only wider; it rests upon a more highly developed record.

One of the main attacks of petitioners on the final orders is that addressed to the over-all 6½% rate of return on the company's electric operations. This is based on a finding by the commission that a rate of between 6.2 and 6.3% would be fair on the basis of the record for the test year to which was added approximately ¼% for future " attrition " of the rate to compensate for the inflationary trend. Of three elements which weigh into a calculation of a fair rate of return, debt, preferred

stock and common stock, based in turn on the proportion of each to the total capital, the main difference in the record between witnesses related to the percentage attributable to the common stock. The commission in its opinion stated this percentage to have been between 8 and 10.5%. Although petitioners contend this should have been pinned down more precisely in the opinion, the omission does not require annulment of the orders when the over-all percentage found of between 6.2 and 6.3% lies well within the range of all the proof before the commission and reasonable calculations based on such proof.

Not only does this process involve an advised judgment, but the resulting over-all rate lies within the proof and is a sufficient resolution of the complex and contested issue before the commission. Moreover the rate of return was not devised in a vacuum. The commission had in 1952 determined that a rate of return of approximately 6% was for this utility company then fair and reasonable and the commission noted that since that time there had been an increase of over $700 million in the long-term debt of the company, increasing the proportion of debt to total capital and that new capital would be required during 1960 through 1963 of $475 million.

We think the finding of a fair rate of return of between 6.2 and 6.3% is sufficiently supported by the record. Nor does the additional allowance in the rate of return of approximately $\frac{1}{4}$% for attrition warrant annulment of the order. There are, in this large record before us, an abundance of statistical data and other information relating to the essential factors which could form the basis of an informed judgment.

The rate is calculated against the experience of the base year, but it is a rate designed for the future and is projected into a period of some years after the promulgation of the order. The purpose of the additional $\frac{1}{4}$% is to protect the basic rate found by offsetting the loss (" attrition ") due to effects of supposed future inflation. This additional allowance, as petitioners note, is in dollars a large sum, $7,000,000 a year; but the basic amounts are large in this scale of utility operations and the question is whether the $\frac{1}{4}$% is arbitrary and without reasonable basis.

The attack is made on both the absence of proof and the lack of findings on this issue. There was, however, evidence of the experience of the company under the 1952 order determining a 6% return that the earnings had declined materially below this point despite plant increases and increased sales of electricity and that the plant extensions proposed during the period 1959–1963 were extensive and at higher unit costs.

In reaching its conclusion that an allowance of about ¼% should be made for this factor, the commission noted attrition or erosion of earnings " lies in the fact that additions to a utility company's plant have not produced proportionate increases in its revenues and earnings because each year's additions to plant have been made at higher unit costs than the unit costs of existing plant ".

Neither in the nature of the evidence before the commission nor in the statement of the reasons for its judgment that ¼% is a proper additional allowance is there a failure to provide adequate foundation to sustain the decision in this respect on judicial review.

The dollar return to the company is found by applying the rate of return to the " rate base ", which is calculated from the depreciated cost of electric plant in operation and an estimated amount for working capital attributed to electric operations. Petitioners contend that the rate base was overstated by $25,000,000 and hence this would improperly increase the amounts payable based on the rate of return.

Part of this overstatement is attributed by petitioners to the inclusion of about $11,000,000 held by the company as a reserve for tax deferrals under the accelerated depreciation allowed by section 168 of the Internal Revenue Code (U. S. Code, tit. 26, § 168) ; and part to a claimed excessive allocation of $14,000,000 to working capital. In the latter class was money collected by the company for city sales taxes; money received from customers' deposits and bank balances claimed to be excessive.

These areas of inclusion or exclusion of some of these items in the rate base seem fairly arguable and petitioners have made a reasonable showing that some should be taken out. Still, this kind of judgment in a technical area of public utility regulation is one that lies within the special competence of the administrative agency and it ought to require more than a suggestion that a court or Judge might exclude such items from the rate base to warrant annulling the final order.

These judgments of the commission may well be debatable; but they are not arbitrary. CARDOZO, J., in City of Rochester (233 N. Y. 39, supra) expressed the opinion that in such an area of administrative judgment of a body of experts, the court is slow to interpose different evaluations of the details of utility supervision. Nor is the decision of the commission in the respects here complained of without reasonable basis. The commission asserts in support of its determination that there is a difference in view among regulatory commissions as to the proper treatment of section 168 of the Internal Revenue Code

deferrals and that in this case its decision, in effect, passed on some of the benefits of the deferral to the consumer and allowed some to the company. (Cf. *Central Maine Power Co.* v. *Public Utilities Comm.,* 153 Me. 228.)

As to the status of customers' deposits as working capital, the commission notes that the company pays 4% interest to the customers and it seems not unreasonable to think, as the commission does, that this money should be treated as " ordinary debt money " and part of working capital. The commission demonstrates sufficiently, too, that the amounts received and held by the company for city sales tax were eliminated from consideration of working capital and to the extent bank balances were included there was a sufficient basis in their necessary utilization in the flow of business of the company.

It is contended also that the commission underestimated the company's income in the test year (1959) by $12,000,000. The main basis of this point is a claim that the company overpaid its wholly owned subsidiary, which owned underground conduits, by $11,500,000. This is largely attributed to increases in charges by the subsidiary in excess of rental charges fixed by a lease.

The commission, in effect, examined the reasonableness of the charges of the subsidiary and approved the payments made as being reasonable, indeed, as though a projected consolidation of the subsidiary had been effected. Then it followed one of the alternatives suggested by this court in *Matter of Yonkers R. R. Co.* v. *Maltbie* (242 App. Div. 319, 321). We see no sufficient basis to interfere with this result.

Moreover, the contention that the commission failed to make proper allowances for the losses sustained by the company on special electric contracts, e.g., with the City of New York and the Transit Authority and hence these deficiencies were passed onto tariff consumers has been sufficiently answered by the commission.

Finally, it is contended by petitioners that in apportioning the burden of the increases in rates, the commission has discriminated against two classes of consumers and that its judgment of allocation is wholly arbitrary and should be annulled. Of the $10,400,000 increase allowed by the final orders, in addition to the $15,700,000 in the temporary orders, substantially all the impact was placed on two classes of consumers. One was service classification S. C. 2, Part C, large consumers such as the petitioner Housing Authority, who were increased approximately $10,000,000. The other was service classification S. C. 4, consumers who submetered electricity to their tenants, who were increased approximately $8,000,000.

The additional $18,000,000 which these two groups thus provided was offset by $8,000,000 in decreased rates for other consumer groups. These reductions were: $1,000,000 in S. C. 1, Part A (smaller residential consumers); $4,000,000 and $3,000,000 respectively in S. C. 2, Part A, and S. C. 2, Part B (small and middle-range industrial and commercial consumers).

A large mass of technical material and argument is addressed on both sides to the justification of these substantial increases to large consumers of electrical energy. The commission in part reached its judgment on the company's cost-of-service study and from testimony of company witnesses in apportioning the cost of providing service among these different classifications. Its allocation of the burden of increases on these two groups of very large consumers is based on its view that they were not contributing their fair share of the over-all cost of service in relation to other groups of consumers.

This, of course, is reasonably debatable; and there is proof in both directions. But decision in this technical and complex area lies within the special competence of the commission. The trend of the proof suggests that the advantages in lower unit cost of electricity that arise under the tariffs from the consumption of very large quantities had an adverse effect on a fair balance among all consumers and did not take fully into account the increased cost of providing electric service as a whole.

This seems not unreasonable in theory; nor has it been demonstrated to be unreasonable in fact by petitioners to the point where we would be required to annul these allocations among consumers on the ground of unjust discrimination. The arguments based on admission of evidence do not warrant judicial interference.

On the whole this is a very complete record. Hearings were conducted for 56 days over two and one-quarter years. The full record occupies over 6,000 mimeographed pages. Cross-examination by the consumer petitioners alone occupies 1,240 pages of the record and there are hundreds of pages of affirmative testimony presented by them. The opinions of the commission alone occupy 176 pages of the appendix. There has been a thorough exploration of the problems presented and a reasonable resolution of them.

The determination should be confirmed, with $50 costs.

BERGAN, P. J., COON, GIBSON, REYNOLDS and TAYLOR, JJ., concur.

Determination confirmed, with $50 costs.