404 P.2d 859

**IDAHO UNDERGROUND WATER USERS ASSOCIATION, Appellant,**

**v.**

**IDAHO POWER COMPANY, Respondent.**

**In the Matter of the Application of Idaho Power Company for Approval of Rates, Rules and Regulations Comprising Proposed Tariff No. 101, IPUC No. 14 and Proposed Rates for Special Contract Customers.**

**No. 9317.**

Supreme Court of Idaho.

July 6, 1965.

Rehearing Denied Sept. 9, 1965.

Louis F. Racine, Jr., Robert C. Huntley, Jr., and William D. Olson, Pocatéllo, for appellant.

R. P. Parry and John H. Daly, Twin Falls, A. C. Inman and J. E. Bruce, Boise, for respondent.

Allan G. Shepard, Atty. Gen., State of Idaho, and Larry D. Ripley, Asst. Atty. Gen., Boise, for Idaho Public Utilities Commission.

McFADDEN, Justice.

Idaho Power Company (the Company) in January, 1962, instituted these proceedings by filing with Idaho Public Utilities Commission (the Commission), its request for 13.6% increase in its rates charged its general users. Various protests, including that of Idaho Underground Water Users Association (the appellant), were filed against the granting of any rate increase. Hearings were conducted and, after the introduction of voluminous testimony and admission of many exhibits, the Commission entered Order No. 6647, denying the Company's proposed tariff and schedule of charges which would have constituted a 13.6% increase in the rates, but directed the Company to submit a revised tariff for an increase of rates of 7.5%. The new tariff was filed and approved by the Commissioner's Order 6659, and on the same day appellant filed its motion for rehearing, directed towards Order No. 6647,

asserting it to be erroneous and contrary to the evidence. This petition for rehearing was denied by Order No. 6680. Appellant appealed from these various orders of the Commission, the effect of which was to grant to the Company a 7.5% increase in the rates charged various of its customers.

Appellant is an unincorporated association, the membership of which is comprised of approximately 5100 users of the electrical power supplied by the Company. The members use the electrical power for the purpose of irrigation and soil drainage pumping, as well as general service and residential usages.

Appellant has made eight assignments of error, five of which (I, II, III, IV, VIII) are directed to Order No. 6647. In assignment V appellant contends that the Commission erred in conducting its hearing without the appearance of the Attorney General on behalf of the people of the State of Idaho; in assignment VI, which is directed to Order No. 6659, appellant claims the Commission erred in approving the revised tariff, asserting the rate increases were not proper or justified; assignment VII, directed to Order No. 6680, asserts the Commission erred in denying appellant's petition for rehearing.

The issues presented by assignments of error Nos. VI and VIII are wholly encompassed within the other assignments of er-

ror pertaining to Order No. 6647 and hence are not considered separately herein.

Appellant's first assignment of error is that the Commission erred in failing to make specific findings in Order No. 6647 as to each of the following:

"(1) Rate base to be used for purposes of computing a Fair Rate of Return.

"(2) What percentage figure constitutes a Fair Rate of Return.

"(3) The amount of Dollar Return the Idaho Power Company would receive without a rate increase and whether that return would be unreasonable.

"(4) The amount of Dollar Return the Idaho Power Company would receive under the 7½% revenue increase granted and that the Return would be fair."

By this assignment, appellant challenges the sufficiency of the findings of the Commission in the particulars set out, asserting the order is so insufficient that it would be impossible from the findings to determine whether the 7.5% increase, any increase or even a rate decrease, is justified.

In answer to this challenge, the Company asserts that under I.C. § 61–626 and § 61–627 matters not raised in the petition for rehearing will not be considered by this court; and further that appellant's petition for rehearing failed to present any issue as to the sufficiency of the findings.

The petition for rehearing submitted by appellant recites:

"Protestant, Idaho Underground Water Users Association, respectfully petitions for a rehearing of Case No. U–1006–42 [the instant proceeding]. Protestant submits that Order No. 6647 *is erroneous and contrary to the credible evidence in the following* material respects." (Emphasis added.)

Then follows some six sub-paragraphs; the first five pertain to specific findings entered by the Commission, each with the assertion that the specific findings referred to were against or contrary to the weight of the evidence presented; the sixth paragraph asserts that the order is in error in granting the increase of revenue without reference or consideration to the value of the service to the classes of customers affected and particularly to the appellant's members. Nowhere does the petition for rehearing seek any modification of the Commission's order in respect to the deficiencies claimed by the first assignment of error.

■ In Consumers' Co., Ltd. v. Public Utilities Comm., 40 Idaho 772, 236 P. 732, this court said (at page 775 of the Idaho Report, 236 P. 732:)

"The purpose of an application for the rehearing provided by statute, and it must be presumed to have a useful purpose, is to afford an opportunity to the parties to bring to the attention of the Commission, in an orderly manner, any question theretofore determined in the matter, and thereby afford the Commission an opportunity to rectify any mistake made by it before presenting the same to the Supreme Court."

A dissenting opinion in the Consumers' Co., Ltd., case (supra) also recognizes this requirement in the following language:

"The purpose of an application for rehearing, in contemplation of this statute, is no different than in proceedings before the courts; that is, to point out specifically in what respect the original decision is erroneous. (citation) The application is confined to matters urged at the original hearing, and may not include new points, raised for the first time, or matters not in the record when the case was decided. (citations.)"

■ The Consumers Co., Ltd., case was before this court a second time the following year, 41 Idaho 498, 239 P. 730, when the principle was again reiterated:

"In asking for a rehearing on order No. 881 on account of the ruling of the Commission on going concern value, appellant must be held to have waived any and all other objections to the order with respect to which it

asked a rehearing. If, after asking for a rehearing of only one of the many questions determined by the Commission, and after the Commission has again heard and decided the particular matter for and on account of which the rehearing is asked and granted, appellant may then not only bring to this court the one question determined on the rehearing but also all the other questions originally decided by the Commission and for which no rehearing was asked, the provision for a rehearing is of no consequence. Of the matters determined by the Utilities Commission, this court will consider only those with respect to which a rehearing was asked." 41 Idaho at 501, 239 P. at 731.

The requirement that claimed error be first submitted to the Commission by a petition for rehearing, is a phase of the doctrine requiring the exhausting of administrative remedies before judicial consideration will be given to issues on appeal. State v. Concrete Processors, Inc., 85 Idaho 277, 379 P.2d 89. In Bohemian Breweries v. Koehler, 80 Idaho 438, 332 P.2d 875, this court also recognized certain generally recognized limitations of the doctrine requiring exhaustion of administrative remedies. 73 C.J.S. Public Administrative Bodies and Procedure, § 173, p. 514; 2 Am.Jur.2d 436, Administrative Law, § 602; 3 Davis, Administrative Law Treatise, § 20.06 (1958).

In further considering this first assignment of error, a brief review of the purpose of having findings by the Commission is in order. I.C. §§ 61–502, 61–503, 61–622, contemplate that on hearings concerning rates of a public utility, findings will be made by the Commission. The procedure to be employed by the Commission in arriving at such findings has been described in Saginaw Broadcasting Co. v. Federal Communications Commission (1938) 68 App.D.C. 282, 96 F.2d 554 (cert. denied Gross v. Saginaw Broadcasting Co., 305 U.S. 613, 59 S.Ct. 72, 83 L.Ed. 391, as follows:

"(1) evidence must be taken and weighed, both as to its accuracy and credibility; (2) from attentive consideration of this evidence a determination of facts of a basic or underlying nature must be reached; (3) from these basic facts the ultimate facts, usually in the language of the statute, are to be inferred, or not, as the case may be; (4) from this finding the decision will follow by the application of the statutory criterion." 96 F.2d at 559.

See also: 2 Am.Jur.2d 256, 269, Administrative Law, § 447, § 456; Annot. 146 A.L.R. 209.

■ The reasons for requiring findings by an administrative agency such as the Public Utility Commission have been cogently expressed in 2 Davis, Administrative Law Treatise, § 16.05 (1958), as follows:

"The practical reasons for requiring administrative findings are so powerful that the requirement has been imposed with remarkable uniformity by virtually all federal and state courts, irrespective of a statutory requirement. The reasons have to do with facilitating judicial review, avoiding judicial usurpation of administrative functions, assuring more careful administrative consideration, helping parties plan their cases for rehearing and judicial review and keeping within their jurisdiction."

As pointed out in the Annotation, 146 A.L.R. 209, a distinction must be kept in mind in evaluating an assignment of error as here presented, such distinction being whether the assignment of error attacks the findings on the basis of a failure to resolve an issue of "substantive" law, rather than a failure to make a detailed finding on an issue of fact as a matter of "procedural" law. In 2 Davis, Administrative Law Treatise, § 16.09 (1958), it is stated:

"The findings requirement may involve either form or substance or both. As we have seen, some cases raise only the question whether the findings the agency has made are too general or too detailed; little more may be at stake than the question whether the agency adequately helped the court to perform its task of reviewing. At the same time, many cases which turn upon the adequacy or inadequacy of findings are not at all concerned with mere matters of form but cut deeply into substance, * * *.

"When a reviewing court determines that the applicable law is different from what the agency has supposed it to be, and when the agency's findings have been based upon the agency's erroneous view of the law, the court often has no choice but to send the case back for administrative findings necessitated by the court's holding on the question of substantive law. If the court itself were to make the requisite findings, it would be usurping administrative power. * * *".

■ It is our conclusion that the first assignment of error not only was not presented to the Commission by the petition for rehearing, required for its consideration by this court, but that the asserted deficiencies in the order present only an asserted procedural deficiency that would not be determinative of this appeal in any event. The substantive aspects of this appeal are

contained in the other assignments of error hereinafter discussed.

Appellant's assignments of error Nos. II, III and IV, are as follows:

"II. The I.P.U.C. erred in failing to exclude from the Rate Base for the Idaho Consumer that portion of the Respondent's plant which is utilized for the production of power for other utilities and consumers outside the Idaho Power Company franchise area.

"III. The I.P.U.C. erred in failing to exclude from the Rate Base those funds in the capital structure which has non-investor supplied funds, such as Accumulated Deferred Taxes and Working Capital.

"IV. The I.P.U.C. erred in Finding 'that the Idaho Power Company should be granted an increase of 7½% in revenues from those classes of customers affected in the application,' the evidence having established that no rate increase is indicated."

In considering these assignments of error, the scope of appeal authorized by the Idaho Constitution and the legislative enactments made pursuant to the constitution must be kept in mind.

Idaho Constitution, Art. 5, § 9 provides:

"The Supreme Court shall have jurisdiction to review, upon appeal, any decision of the district courts, or the judges thereof, and any order of the public utilities commission, and any order of the industrial accident board: the legislature may provide conditions of appeal, scope of appeal, and procedure on appeal from orders of the public utilities commission and of the industrial accident board. On appeal from orders of the industrial accident board the court shall be limited to a review of questions of law. * * *"

I.C. § 61–629, dealing with the scope of review of orders of the Commission on appeal to this court, provides:

"No new or additional evidence may be introduced in the Supreme Court, but the appeal shall be heard on the record of the commission as certified by it. The review on appeal shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order appealed from violates any right of the appellant under the constitution of the United States or of the state of Idaho. * * *"

In Petition of Mountain States Telephone & Tel. Co., 76 Idaho 474, 284 P.2d 681, it was stated:

"The function of rate making is legislative and not judicial. The commission as the agency of the legislative

department of government exercises delegated legislative power to make rates. So long as it regularly pursues its authority and remains within constitutional limitations, the courts have no jurisdiction to interfere with its determinations." 76 Idaho at 480, 284 P.2d at 683.

■ One other point warrants brief comment, prior to discussion of the assignments of error in question. Respondent asserts that the issues presented by appellant's assignments of error now being considered were not first submitted to the Commission on appellant's petition for rehearing. With this contention we do not fully agree. By taking a liberal view of the petition for rehearing, the issues presented by appellant by these assignments of error were first presented by the petition for rehearing, unlike the issues presented by the first assignment of error.

As concerns appellant's assignments of error regarding the rate base used by the Commission, appellant argues that the Commission erred in including the portion of the Company's plant utilized for the production of power for other utilities, and also for including funds which are "non-investor supplied funds, such as Accumulated Deferred Taxes and Working Capital."

Idaho Power Company, a public utility regulated by the Commission, serves con-sumers in Idaho, Nevada and Oregon. In addition to the consumers served, it also has "firm" contracts to deliver high voltage power at "wholesale" rates to power companies in Nevada, Oregon, Utah; and it sells "dump" or excess power to these and other utilities. The Company is also inter-connected by lines with the other power companies in neighboring states and is required under the provisions of its Federal Power Commission license to coordinate its system with the Northwest Power Pool.

The Company has previously applied to the Federal Power Commission for authority to construct certain hydro-electric facilities on the Snake River. Federal Power Commission granted the Company a license for construction of three dams and generating facilities at Brownlee, Oxbow, and Hells Canyon on the Snake River. The Brownlee project was completed and in service in 1958; the Oxbow project was completed and in service in 1961. Hells Canyon is estimated to be completed and in service by 1967.

Appellant contends that the rate base used by the Commission in determining to grant a 7.5% increase in rates should be reduced by $52,129,794, which includes:

1. $47,558,443 representing the investment of the Oxbow hydro-electric plant put in service in 1961.

2. $4,571,351 representing the investment in fish facilities required under the license granted by the Federal Power Commission.

It is the appellant's contention that the amount invested in the Oxbow facility is unnecessary for the needs of industrial power users in Idaho until after 1966, and hence constitutes an overbuilding of the production facilities of the Company; that by inclusion of such facility in any rate base, when the record indicates that sales of power to the other utilities constitutes approximately ⅓ of the total power sales, the electrial power users of Idaho are being unfairly treated, by placing an unfair burden on them. The appellant contends this facility is not used for the benefit of the power users of Idaho and hence should not be included.

In Finding VII, the Commission stated:

"That the rate base to be used in this proceeding should be composed of the average cost of the electric plant in service less the reserve for depreciation, contributions in aid of construction and contributions in deferred credits, plus an allowance for working capital."

Previously in its order No. 6647, the Commission, in discussing the evidence presented, and the contentions of the parties, stated:

"The applicant, through witness Ilch, submitted exhibits showing a rate base composed of the average net plant in service less the average of the depreciation reserve, contributions in aid of construction and contributions in other deferred credits. To this total was added working capital consisting of the average of the material and supplies account and 12-½% of the annual operating expenses. For the year 1960, the base thus calculated was $236,856,-139. For 1961 it was $269,143,171 and for 1962, estimated, it was $302,709,178. The applicant also submitted a rate base having the same components, but determined as of the end of the year 1962, estimated, and this amounted to $305,-551,987. The applicant used the same procedures for the determination of the estimated rate base for the years 1962 through 1969. In 1969 the average net investment rate base is shown to be $416,639,000."

Appellant points to the case of Idaho Power Company v. Thompson (S.D. Idaho 1927), 19 F.2d 547, as authority requiring that the valuation of the Oxbow plant be excluded. In that case Idaho Power Company sought an injunction against enforcement of rates prescribed by the Public

Utilities Commission. The Company had a 3,000 K.W. generator in its plant at American Falls. It added a second generator of 6,000 K.W. capacity for its own purposes, and then entered into a contract with Utah Power and Light whereby a third generator of 6,000 K.W. capacity was added. This last generator cost $629,444.00, the annual expense of operation and maintenance of which was $11,797.00, bringing in an income of $109,416 per annum. On the base, after deducting expenses, the Company had a 15.5% return. The Company, in that action, argued that since the third generator unit wasn't serving its Idaho consumers, the cost should be left out of the base, and revenue should not be computed in its gross income, and the Federal court so held. In its opinion, the court stated:

"But in the view we have taken the construction of the unit was in advance of normal public need for service, and was to a degree an independent enterprise, involving a measure of risk not incident to normal additions to a utility system. In that view the plaintiff is chargeable only with the value of the use it thus makes of the property included in the rate base for consumers.

"Upon the whole, we conclude that a fair adjustment for present purposes would be to exclude the cost of the unit from the rate base, and divide the net income by crediting the system with $22,000." *19 F.2d at 571.*

The cost of the third generator was excluded from the rate base, and income therefrom was excluded from the Company's operating revenue on the ground that it had been installed specifically and solely for the Utah company's service.

However, in the instant case the Company has contracts with power companies in neighboring states for the sale of power at specific rates to be supplied from the overall system, not from any specific source. Testimony of the Company's witnesses discloses that the peak demand for power arises during the summer months, during the irrigation period and the facilities at Oxbow were necessary in order to fulfill this demand; that the contracts entered into by the Company with the power companies of the neighboring states provide a profitable market for the Company's winter power—the time of lower demand and greatest output by reason of the higher water. It is further to be noted that the testimony of the Company's witnesses discloses that on the basis of the rates charged under these various contracts, there is a rate of return on this portion of their business of from 6.04% to 6.54%, which the record further discloses is above the rate of return from that of its other users.

■■ A public utility, in the nature of its operation, is obligated to anticipate the

demands to be made upon it for service in future years. Cf. Re Public Service Co. of N. H., 27 P.U.R. 3rd 113; Pacific Telephone & Telegraph Co. v. Wallace, 158 Or. 210, 75 P.2d 942 (1938); 73 C.J.S. Public Utilities § 18, p. 1017. Here the record amply supports the view that this facility was deemed essential in order that the Company meet the anticipated demands in the years following its construction and completion (unlike the facts in Idaho Power Company v. Thompson, supra) and was primarily installed not to serve customers outside the state, but to serve the present and future demands of the Idaho customers.

The formula employed by the Commission in establishing the rate base has been approved by this court in the case of Application of Pacific Tel. & Tel. Co., 71 Idaho 476, 233 P.2d 1024, where this court held that an application for approval of a schedule of rates, requires a valuation of the company's property used and useful in the service. In that case the Commission used as a formula for fixing the value of the company's property to be used in determining the rate base, the following: the original cost of the property, plus material and supplies, plus working capital, less the allocation or actual amount of the depreciation reserve.

There is no quarrel with the contention that property not employed in the public service should not be incorporated into the base to be used to compute the fair rate of return. However, it must be kept in mind that whether utility property is used or useful for inclusion in the rate base, is a factual determination rather than a legal question. Lake Superior District Power Co. v. Public Service Commission, 235 Wis. 667, 294 N.W. 45 (1940). In 73 C.J.S. Public Utilities, § 18a, p. 1017, it is stated:

"On the other hand, property or equipment provided or acquired in anticipation of reasonable future need should be allowed as part of the rate base even though wholly or partially unused at the time to which the inquiry relates. In determining whether excess plant capacity shall be included in the rate base, a utility must have some latitude with respect to plant enlargement undertaken to meet the requirement imposed on it to furnish service when and as demanded by the public, and, while the utility must bear the burden of an unreasonable extension of its plant and the risk that portions of it prudently acquired may become obsolete or not useful, it should not be penalized for failure exactly to anticipate future demands for service in a period of depression."

It is also to be noted that in its order No. 6680, denying appellant's petition for re-

hearing, the Commission pointed to other facts presented by the record and considered by it, and stated in regard to the facilities included in the rate base:

"* * * It suffices to state here that the utility sales are at high transmission voltage, with single point delivery, where to nearly all other customers (including the Association's members) power supplied is furnished at distribution or actual use voltage and at the customer's numerous points of use. Further, the *evidence showed that the average rate per kilowatt hour for sales to other utilities was actually higher than the Company's sales to its large commercial and industrial customers (receiving distribution voltage power), the only other comparable class of users.* The basic fact, however, as this Commission said (page 11), is that if sales to other utilities brings in the Company a greater rate of return than the average rate for the system as a whole, then these utilities sales are not detrimental but a natural benefit to other rate payers. *The evidence showed that the return from utility sales was considerably higher than the return from sales to other customers, and higher than on its total sales, including the sales to other utilities.* * * *" (Emphasis supplied.)

While appellant strenuously contests the propriety of including the valuation of the Oxbow plant in the rate base employed by the Commission, and points to facts at variance with facts mentioned above, exhibits before the Commission disclose that the Company had allocated a portion of its plant devoted to service to consumers outside Idaho, and that the Commissioners' valuation of the plant for the rate base excluded that portion of the plant devoted to service of customers outside the state. The most favorable view of appellant's contention is that at best it has presented a possible conflict in the record. This, however, is insufficient to justify this court in saying that as a matter of law the Commission erred in its determination of this aspect of the rate base.

As concerns appellant's assignment of error III challenging inclusion in the rate base of accumulated deferred taxes and working capital, the Commission in its Order No. 6647 stated:

"* * * the protestants challenge the inclusion of two other items. They argue that the Commission should not allow the amount for working capital in the rate base because this assumes that the expenses of the applicant during an accounting period precede the receipt of the corresponding income. The protestants also argue that the rate base

should be further adjusted by deducting therefrom the amount of plant acquired with funds from accumulated deferred taxes. The reason for the argument is that the applicant uses the amounts of cash generated by this procedure in lieu of borrowing of comparable amounts of such capital from other sources and that the amount accrued in this reserve is provided by the ratepayer to whom the benefits should accrue.

"The Commission has given consideration to the arguments set forth by protestants on the elimination of these items from the rate base. On the question of the elimination of working capital from a rate base, regulatory commissions have held both pro and con in numerous cases, the decision in each case largely depending upon the facts involved, the reasonableness of the utility's claimed allowance and the regulatory policy of the particular commission on other questions affecting rate base. The protestants made no contention that the applicant's claimed allowance for working capital is in any way unreasonable or excessive or that annual average monthly balances for materials and supplies would not require the continued investment for that portion of total working capital. The

method followed by the applicant in determining its working capital requirement in the present case is identical with that followed in applicant's last rate proceeding before this Commission * * *.

"With regard to the question of deducting from the rate base the amount of the accumulated deferred taxes, it is the Commission's position that these funds have been invested in the property devoted to the public service, and that if liberalized methods of depreciation had not been adopted by the applicant for tax purposes, the amount of the tax deferral that represents additional capital would have had to be provided through the sales of additional securities at considerably higher cost. It is our opinion that in considering the income tax deferral for rate making purposes in this proceeding, we should adopt the same treatment as we did in the Washington Water Power Case. In that case, we allowed the normalization of income taxes and adjusted the rate of return to reflect the existence of non-investor supplied funds in the capital structure."

Appellant asserts that there was incorporated in the rate base some $9,222,250

which arose from the fact that the Company is permitted to employ a different method of depreciation for tax purposes than for rate-making purposes; also that there is included $2,269,778 in the base as working capital. Appellant argues that these funds arose not from contributions from the investors in the Company, but arose by reason of payments made by the consumer, and hence such funds should not be used in establishing the rate base.

First as concerning "working capital", the Company contends that the necessity of maintaining sufficient "working capital" is a customary item in any business; that the sum included in the rate base was realistic, being the average of the monthly inventories of materials and supplies, plus the amount of cash necessary for forty-five days or 12.5% of the annual operating and maintenance expenses of the Company.

▮ Other regulatory commissions have approved such method of computation. Public Service Commission v. Utah Power & Light Co. (Utah 1943), 50 P.U.R. (NS) 133; Re Iowa-Illinois Gas & E. Co. (Ill. 1958), 26 P.U.R. 3rd 369. This court in Boise Artesian Water Company v. Public Utilities Comm., 40 Idaho 690, 236 P. 525, has previously recognized the propriety of including working capital in the rate base. In Petrolane Gas Service, Inc. v. Idaho Public Utilities Commission, 85 Idaho 593, 382 P.2d 777, this court again recognized the principle announced in Capital Water Co. v. Public Utilities Comm., 44 Idaho 1, 262 P. 863, that the sum necessary for working capital of a utility is addressed to the sound discretion of the Commission, and in the absence of an abuse of discretion will not be set aside.

▮ As concerns the use of funds generated from deferred taxes and used in computing the rate base by the Commission, the record reflects the Commission considered these moneys in the determination of a reasonable rate of return to be authorized the Company. In City of New York v. Public Service Commission (Sup. Ct.1963) 17 A.D.2d 581, 237 N.Y.S.2d 617 (appeal denied, 13 N.Y.2d 594, 241 N.Y.S. 2d 1025, 191 N.E.2d 680, Ct.App.1963), discussing an attack on similar inclusion of deferred tax moneys being incorporated into the rate base, that court expressed the view we deem to be correct, as follows:

"These areas of inclusion or exclusion of some of these items in the rate base seem fairly arguable and petitioners have made a reasonable showing that some should be taken out.

Still, this kind of judgment in a technical area of public utility regulation is one that lies within the special competence of the administrative agency and it ought to require more than a suggestion that a court or judge might exclude such items from the rate base to warrant annulling the final order.

"These judgments of the Commission may well be debatable; but they are not arbitrary. Cardozo, J., in City of Rochester [v. Rochester Gas & Electric Corp.] (233 N.Y. 39, 134 N.E. 828, supra) expressed the opinion that in such an area of administrative judgment of a body of experts, the court is slow to interpose different evaluations of the details of utility supervision. Nor is the decision of the Commission in the respects here complained of without reasonable basis. The Commission asserts in support of its determination that there is a difference in view among regulatory commissions as to the proper treatment of Internal Revenue Code, § 168, deferrals and that in this case its decision, in effect, passed on some of the benefits of the deferral to the consumer and allowed some to the company. (Cf. Central Maine Power Co. v. Public Utilities Comm., 153 Me. 228, 136 A.2d 726)" 237 N.Y.S.2d, at 623.

In view of the record which discloses that the projected rate of return computed on the basis of the requested rate increase of 13.6% would not exceed what was considered as a reasonable rate of return testified to by both the appellant's expert witness, as well as the Company's witnesses, no error appears in this regard. The Commission determined that the Company was entitled to a 7.5% rate increase, and not the 13.6% requested.

Concerning appellant's assignments of error to the effect that the evidence establishes that no rate increase whatsoever was justified, being assignments Nos. IV and VI, the record as a whole justifies the award. It is recognized that there is a conflict between the theories of the appellant and the Company as to what would justify an increase of any sort. The record, both documentary and oral, shows that under the proposed tariff of 13.6% as applied to the income projected for future years, the rate of return to the Company is below that recognized as a reasonable rate of return by both the witness McIntosh and the Company's witness Roach, the

president of the Company. McIntosh testified as follows:

"Q. What in your opinion is a fair rate of return to the Idaho Power Company at this time?

"A. In my opinion, the fair rate of return to the Idaho Power Company is 5.73 percent."

Mr. Roach had previously testified:

"Q. And applying these various factors that we talked about, what in your opinion is the rate of return that is necessary for the continued successful operation of the Idaho Power Company at the present time?

"A. Well, of course, I think as a practical matter the term 'rate of return' means sufficient money to—or

dollars to pay all of your operating expenses, to meet your security responsibility, and to leave enough in the way of a residue to insure to the common equity a return commensurate with the returns being earned by other industry with which you have to compete for funds in the market.

"And in my opinion in the case of the Idaho Power at the present time to meet that obligation would require a return on an original cost depreciated rate base of no less than 6½ percent."

The following tabulation from Exhibit 10, Schedules 1 and 11, and Exhibit 11, indicates the revenue, investment and rate of return for 1960, 1961, and estimated for 1962

## "REVENUE, INVESTMENT AND RATE OF RETURN

|  | (1)<br>1960 | (2)<br>1961 | (3)<br>Est. 1962 |
|---|---|---|---|
| Operating Revenues | $ 37,411,248 | $ 41,329,265 | $ 44,801,400 |
| Operating Expenses | 23,942,988 | 26,361,906 | 29,699,200 |
| Operating Income | $ 13,468,260 | $ 14,967,359 | $ 15,102,200 |
| Year average Plant Investment and Working Capital | $236,856,139 | $269,143,171 | $302,709,178 |
| Rate of Return | 5.69% | 5.56% | 4.99%" |

The following tabulation, compiled from Exhibits 29, 29–D and 29–L indicates the estimated rates of return, projected for the years 1963–1969, under the former rates to customers, together with a computation under the 13.6% increase requested, and the 7.5% increase allowed:

### "ESTIMATED RATES OF RETURN, 1963–1969

|  | Under old Tariff Rates | Under Proposed 13.6% Increased Rates | Under 7.5% Increase Allowed by PUC |
|---|---|---|---|
|  | Ex 291[a] | Ex 29 Sch 11, Table 4; & Ex 29–D, p 6 |  |
| 1963 | 5.05% | 5.71% | 5.41% |
| 1964 | 5.07% | 5.77% | 5.46% |
| 1965 | 5.15% | 5.88% | 5.55% |
| 1966 | 5.28% | 6.04% | 5.70% |
| 1967 | 5.07% | 5.80% | 5.47% |
| 1968 | 4.70% | 5.42% | 5.09% |
| 1969 | 4.80% | 5.56% | 5.22%" |

The Commission having considered the requirements of the Company to meet the projected increased demands for service, with its commitment for future investment for construction of additional hydro-electric generating facilities and the requirements for procuring of funds to complete such program, no error appears in the Commission's determination authorizing the rate increase. Petition of Mountain States Telephone & Tel. Co., 76 Idaho 474, 284 P. 2d 681; Petrolane Gas Service, Inc. v. Idaho Public Utilities Com'n, 85 Idaho 593, 382 P.2d 777.

Concerning assignment of error VIII wherein it is asserted the Commission failed to consider the value of the services to particular classes of customers, the specific economic conditions affecting members of the appellant association, or the economy of the State of Idaho, we deem this assignment to be without merit. The Commission had before it voluminous testimony concerning the economic conditions of the farming community, the future demands for power for pumping, and many other factors. Certainly we do not minimize the problems created by the "economic squeeze" of increased costs with lowering prices, as testified to by members of appellant; but the record discloses these factors were fully considered by the Commission, and thus are

not reviewable by this court, except to determine whether there was evidence to sustain the determination made. Washington Water Power Co. v. Idaho Public Util. Com'n, 84 Idaho 341, 346, 372 P.2d 409.

■ The last assignment of error to be specifically discussed pertains to the issue presented by assignment No. V, that the Commission conducted its hearings herein without the appearance of the Attorney General on behalf of the people of the State of Idaho, as provided by I.C. § 61–204. In this regard no question as to the lack of representation of the people of the State was presented at the inception of the hearing before the Commission. Further an Assistant Attorney General was present and participating in the proceedings. I.C. § 61–204 does not contemplate more than that. No error appears in this record.

The orders are affirmed.

Costs to respondent.

McQUADE, C. J., and SMITH and KNUDSON, JJ., concur.

OLIVER, District Judge (dissenting).

The majority opinion herein concludes that appellants, having failed specifically to bring to the attention of the Commission asserted deficiencies of the findings contained in the order, cannot now have such deficiencies considered by this court. With this conclusion, I cannot agree. I feel that this court not only has the power, but also the duty to require the Commission to make such findings as will justify its conclusions.

The majority opinion relies upon Section 61–626 I.C. as amended to support its position in this regard. I do not read the prohibitions into such section that the majority does. If an extremely strict interpretation of this section were to be applied, I would conclude that the appellants *could not* request additional findings or complain of the Commission's failure to find specifics in an application for rehearing. Said section states:

"After an order has been made by the commission, any * * * or person interested therein shall have the right * * * to apply for a rehearing *in respect to any matter* determined therein * * *."

Could a strict construction not therefore infer that an application for rehearing *could not* complain of any matter not "determined therein"? Where can one apply for relief, if not to this court by way of appeal?

In addition, Section 61–622 I.C. provides that:

"No public utility shall raise any rate * * * except upon a showing before the commission and a *finding by the commission* that such increase is justified."

A conclusion of the Commission that an increase is justified cannot substitute for the statutory requirement for *findings of fact.*

This court has held in non-commission matters, that the purpose of requiring findings of fact is to aid the appellate court by affording it a clear understanding of the basis of the trial court's decision and that a failure to make findings cannot be disregarded unless the record is so clear that the court does not need their aid. Merrill v. Merrill, 83 Idaho 306, 362 P.2d 887. I find nothing in Section 61-626 I.C. that requires the court to change its position in matters involving the Commission.

In interpreting civil rules of procedure which require the making of findings (Rule 52[a]) courts have held the requirement for findings must be met regardless of specific request for same by the parties. Hill v. Ohio Casualty Ins. Co., 6 Cir., 104 F.2d 695. On many occasions this court has remanded non-commission matters to the trial courts for specific findings.

Extreme public interest in these commission matters requires findings sufficient to justify the Commission's conclusions.

In any event, I cannot help but conclude that the petition for rehearing by appellant was sufficient, even under the theory of the majority of this court, to require the commission to make specific findings.

Paragraph #3 of the petition for rehearing reads:

"3. The Order errs (Finding No. V) in granting to the Idaho Power Company an increase of 7½% in revenues from those classes of customers affected in the application without in any manner showing the amount of additional revenue to be obtained by the Idaho Power Company from an increase in revenues and without in any manner showing or establishing that the present rates are not fair. In this respect the Order is contrary to the evidence which established that the present rates produce a fair rate of return based upon all of the applicable factors and considerations required of this honorable Commission and that the present rates are lawful, reasonable, and nondiscriminatory."

I believe the foregoing was a clear request and invitation to the Commission to find specifically what a "fair rate of return" is and thus justify its conclusion that a rate increase is justified.

Neither can I agree with the majority in concluding that appellants' request for findings involve "procedural" as opposed to "substantive" issues. It appears to me that the substance of the entire proceeding is a determination as to the justification for a rate increase and findings of fact to support such a determination.