GENERAL TELEPHONE COMPANY OF
the MIDWEST, Appellee,

v.

IOWA STATE COMMERCE
COMMISSION, Appellant.

No. 61283.

Supreme Court of Iowa.

Feb. 21, 1979.

Leo J. Steffen, Jr., Asst. Commerce Counsel, Davenport, for appellant.

James L. Krambeck of Ahlers, Cooney, Dorweiler, Haynie & Smith, Des Moines, and John Robert Jones of Power, Jones & Schneider, Columbus, Ohio, for appellee.

D. H. Sitz of Lane & Waterman, Davenport, for amicus curiae, Davenport Water Co.

HARRIS, Justice.

This appeal from the action of the Iowa commerce commission (the commission) in a rate case is controlled by the statutory burden of proof and the scope of our review. The commission appeals from a trial court judgment which reversed the decision of the commission. We find substantial evidence to support the action of the commission. Hence we reverse the trial court and remand the case for an order reinstating the decision of the commission.

General Telephone Company of the Midwest (the company) is a Missouri corporation with principal offices in Grinnell, Iowa. It does business in Iowa, Minnesota, Missouri, Nebraska, and Kansas. During the test year of 1971 (the year used by the commission in determining the reasonableness of the company's proposed rate increase) the company served 116,572 telephones in 115 exchanges throughout Iowa.

The company is a wholly owned subsidiary of General Telephone and Electronics Corporation (GTE). GTE, in addition to being the parent corporation of the company, also owns two other corporations whose affairs are important in this dispute.

GTE owns GTE Automatic Electric, Inc. (Automatic). Automatic manufactures and supplies a general line of telephone equipment and supplies. During 1971 the company, without competitive bids, purchased 92.4 percent ($2,530,245) of its Iowa materials and supplies from Automatic.

GTE also owns General Telephone Directory Company (Directory Company). In 1971 $397,052 of Directory Company's gross revenues resulted from sales to the company's Iowa operations. As of January 1972, with only minor exceptions, Directory Company published the directories for all GTE affiliated companies in the nation, including the company. It also published the directories for 194 nonaffiliated independent telephone companies.

The Directory Company enters into five-year contracts with GTE affiliates, always without submission of any competitive bids. Competitive bids are submitted to nonaffiliated companies for their business. Since 1960 the Directory Company has never lost the business of any of the GTE affiliated telephone companies.

The procedural history of this dispute is rather typical. The company filed with the commission a proposal to substantially increase local rates based on operations in Iowa during 1971. This proposed rate increase was ordered suspended during investigation of the proposal by the commission. The company later placed the rate increase into effect, subject to refund under bond. See § 476.6, The Code.

Hearings on the rate increase began November 1972 and ended in July 1973. Twelve witnesses testified for the company and five for the commission staff. Eighty-six exhibits were received in evidence. The company's principal expert witnesses were Herbert Meyer, a vice president and director of GTE, and Paul Garfield, an economics consultant from the firm of Foster Associates, Inc. The commission staff's main expert witness was Charles Marberry, professor of finance at the University of Iowa.

The commission's ruling denying the requested rate increase was filed January 4, 1974. The company was directed to refund all money received as the result of the rate increase and was given 30 days to file a refund plan. The company filed for rehearing on various bases. The commission staff resisted the rehearing application.

On March 19, 1974, the commission modified its ruling in only one respect. Under the modification the company was not required (as it had been in the original decision) to make a book reduction of its plant account in an amount of $782,544. This modification is not an issue in this appeal.

A petition for judicial review was filed in the trial court, asserting the decision of the commission resulted in denial of a fair rate of return, was arbitrary and capricious, an abuse of discretion, beyond the jurisdiction of the commission, and was unsupported by substantial evidence. In considering the company's proposed rate increase the commission employed the "return on rate" concept:

Rate Base × Rate of Return = Profits

The company charged that in using this concept the commission acted illegally in: (1) ordering the downward adjustment of $782,544 to the company's rate base for Automatic's alleged excess profits in its dealings with the company; (2) increasing the company's revenue by $22,994 to reflect excess profits of the Director Company in its dealings with the company; (3) applying the double leverage concept to reduce the company's rate of return because Sylvania (GTE's manufacturing subsidiary) was thought to be generating insufficient earnings; and (4) making a further adjustment (for federal income taxes) not involved in this appeal. The company prevailed on the first three claims set out above.

The trial court reversed the commission's decision and ordered the case remanded to the commission for determination of fair and reasonable rates. This appeal was taken by the commission from that ruling.

I. *The standard for our review.* The hearings conducted by the commission during 1972 and 1973 were guided by chapter 490A, The Code, 1973. The company, under § 490A.8, The Code, 1973, held the burden of proof to prove it would make no unreasonable profit under the rate increase. The burden remains the same under § 476.8, The Code, 1977.

On January 4, 1974, chapter 490A was renumbered by the code editor as chapter 476. Sections 490A.14 through 490A.19 (judicial review and standards for review) were repealed by the Acts of the 65th G.A., 1974, chapter 1090, § 211. Review is now provided for in § 476.13, The Code, which adopts the standards appearing in chapter 17A, The Code (Iowa administrative procedure act).

■ Under this standard we are not bound by any findings of the trial court. We have said:

"An appeal from the determination of the district court is allowed under § 17A.20. Our review in a contested case under § 17A.20 is not de novo. Our task is to review the record in the manner specified in § 17A.19(7) and make anew the judicial determination specified in § 17A.19(8). Our review is limited, as the district court's review should have been, to the record made before the hearing officer." *Hoffman v. Iowa Dept. of Transp.,* 257 N.W.2d 22, 25 (Iowa 1977).

■ In applying § 17A.19(7) it is to be remembered that a rate-making case is a "contested case." § 17A.2(2), The Code. With certain exceptions not applicable here

(see 2 Am.Jur.2d, Administrative Law, § 726, p. 627 and 73 C.J.S. Public Administrative Bodies § 246, Supplement, footnote 46.5) our review is limited to those questions considered by the commission. 2 Am. Jur.2d, Administrative Law, § 724, pp. 624–625; 73 C.J.S. Public Administrative Bodies and Procedure § 246, p. 613; *Unemployment Comp. Com. v. Aragon*, 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136, 146 (1946); *United States v. L. A. Tucker Truck Lines*, 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54, 58 (1972).

We turn to the issues raised by the company in its petition for rehearing filed with the commission. We believe three major issues were preserved for judicial review. In addressing these three issues our task is to determine whether, based on the evidence before the commission, the contested ruling violated § 17A.19(8).

It would unnecessarily extend this opinion to discuss in detail each argument made in connection with the three issues. They will be discussed generally in the divisions which follow.

II. *The rate base.* The commission established the company's rate base by the "original cost depreciated or prudent investment" method which we defined in *Davenport Water Co. v. Iowa State Commerce Com'n*, 190 N.W.2d 583, 588 (Iowa 1971):

"A rate base determined by 'original cost depreciated or prudent investment' usually consists of original cost of the property used or useful in rendering services, plus working capital, less accumulated depreciation and contributions to construction and capital. This is ordinarily determined by an analysis of the utility's books and records. [Authorities.]"

We approved this method in *Davenport Water Co.* and implicitly in *United Tel. Co. of Iowa v. Iowa State Com.*, 257 N.W.2d 466, 472–473 (Iowa 1977). The company challenges the method, insisting that the rate base should include things not reflected in book value, such as goodwill. But we believe the cases just cited hold there is no requirement for the commission to make such an adjustment.

The commission on the other hand did make an adjustment to the company's book value by deducting what it found to be unreasonable profits Automatic made in selling goods to the company. In finding Automatic's profits were unreasonable the commission used the "cost standard." Under this standard profits are limited to the recovery of the reasonable cost of furnishing goods and services plus a reasonable return on capital invested in the business. Applying the cost standard, the commission again used the original cost depreciated or prudent investment method. The resulting reduction was consistent with the commission's guiding philosophy in rate making: the obtaining of maximum service with minimum cost for the public. The commission refused to consider costs which it believed were not justified in providing service.

In determining the reasonableness of Automatic's profits in its transactions with the company, the commission rejected methods the company proposed for making the determination. The company wished to determine Automatic's profits by comparing Automatic's prices with prices offered by businesses furnishing the same services or products. But this suggestion was rejected by the commission on a finding that such comparisons are irrelevant to the question of the reasonableness of profits in dealings between two subsidiaries. The commission felt that the mere comparison does not prove the profits to be reasonable.

The commission also rejected another company proposal. The company proposed to measure the reasonableness of Automatic's profits on its transactions with the company by determining the margin of profit on these transactions. The commission's rejection of this proposal, in effect, noted that a company could make unreasonable profits in relation to its investment even with a low margin of profit on each sale, if there were many sales. Accordingly, the commission felt that in order to use a margin of profit analysis it would also have to consider the ratio of sales to investment.

The commission made a further rate base adjustment which also addressed Automatic's transactions with the company. The items purchased by the company from Automatic consisted largely of capitalized depreciable property. The depreciation of this property, for tax purposes, affects the rate base determination because its value (determined in relation to its depreciation schedule) is included as a part of the property and capital which the company uses to provide utility service. The depreciation of this property is affected by an accounting procedure employed by GTE for tax purposes. GTE is permitted to file a consolidated tax return encompassing its own operation and that of all its subsidiaries. As a part of this procedure GTE is allowed to eliminate from the consolidated return all profits realized on transactions between GTE's subsidiaries, such as those between Automatic and the company.

However, GTE collects payments from its telephone subsidiaries for taxes as if the intercompany profits were taxable and as if they had not been eliminated from the consolidated tax return. This practice clearly results in the collection of tax payments from operating subsidiaries well in advance of the time for payment of taxes on intercompany profits.

Thus the company, like other telephone subsidiaries in the system, pays income taxes to GTE at the statutory rate. GTE remits to the operating telephone subsidiaries 48 percent (representing the federal corporate income tax rate) of the total profits of manufacturing subsidiaries (eliminated in the consolidated return) prorated on the basis of gross intercompany profit from their purchases. The subsidiaries, including the company, credit such "refund" to a "plant" account. The effect is to penalize the company for profits Automatic made on transactions with the company and on which taxes are deferred. This is because the deduction of Automatic's profits on a particular sale (on which taxes are deferred), from the depreciation base of that sale item, robs the company of a higher depreciation basis and thus allows it less of a tax deduction. A higher future income tax will result because there will be less of a tax deduction to minimize tax liability. The increase in taxes will ultimately be borne by the rate payers, who pay all the costs of the company's utility service.

■ The company argues that the reduction of its rate base due to unreasonable profits made by Automatic in its transactions with the company, and the reduction of the rate base due to the tax deferral refund, constitute a "double counting." But we think the position of the commission is supported by our holding in *United Tel. Co. of Iowa*, supra, 257 N.W.2d at 474–477. The issue in *United Tel. Co. of Iowa* differed from the question in this case only in that there was a failure to execute a closing agreement in the former case. As a result, part of United Tel. Co. of Iowa's profits were placed in its parent company's tax deferred account. In the present case there was a closing agreement which caused the profits to be credited to the company's tax deferred account. We do not believe the distinction should affect the result. The crediting of the profit to a particular account does not affect the fact that the parent company benefits at the expense of the rate payers.

■ We find the company has not carried its burden of proof in challenging the commission's determination of the rate base.

■ III. *Rate of return.* The commission, after having established the rate base, proceeded to find a fair rate of return for the company. This fair and reasonable rate of return is expressed as a percentage which, when applied to the rate base, produces the return to which GTE is entitled on its investment in the company. The object of this determination is to provide a reasonable rate of return on investment which will attract investors to the company. This return should be roughly equivalent to the return offered by similarly situated businesses in the same industry. Obviously rough approximations are used. The commission used the "cost of capital" approach in making this determination.

This approach is complicated in this case because the company is a wholly-owned subsidiary of GTE. Hence it attracts no investors. Those who invest in the company buy GTE stock. Accordingly a fair rate of return for the company which is adequate to attract investors is determined in relation to GTE's capital structure. In this case, as in *United Tel. Co. of Iowa*, supra, the commission determined the cost of capital as filtered through GTE's corporate capital structure by using the "double leverage" concept. The label for this concept is derived from the fact that the total picture of the company's well-being, from an investor's standpoint, cannot be determined merely by analyzing the company's balance sheet. The situation here differs from the typical corporation. The attractiveness of the company as an investment is dependent on how attractive the parent company is as an investment. The concept is based on the assumption that, because the parent company owns the subsidiary, the subsidiary's mix of debt, preferred stock, and common stock is a reflection of the parent company's capital's structure.

In applying the double leverage concept in this case the commission first determined the cost of capital for GTE. Thus it determined what was a reasonable return on investment which would attract investors to GTE. In this "first approximation" the commission considered how GTE is viewed as an investment on the market. To determine this, the commission adopted what is referred to in the record as the "discounted cash flow method" (DCF). This is expressed in the following formula:

However, after making a first approximation based on this formula, the commission, through the testimony of its expert witness Dr. Marberry, reduced the yield portion of the equation.

This reduction was performed because GTE's manufacturing subsidiary, Sylvania, was not generating sufficient earnings from its sales, principally of consumer goods. This conclusion, and the corresponding reduction, were the result of Dr. Marberry's analysis of the earnings of the stock of 35 companies similarly situated to Sylvania. In each of these analyses the earnings were determined in relation to the stock's stated book value. It was determined that Sylvania acted as a drag on the earnings of GTE, making GTE look less attractive to investors. This in turn drove up the cost of capital, or rate of return necessary to attract investors.

Because the commission was interested in determining the adequate rate of return only for the company, Dr. Marberry artificially adjusted downward the rate of return for GTE. He did so hypothesizing a healthy Sylvania. A healthy Sylvania would not distort the rate of return for GTE (from which the rate of return for company was derived).

The company argues that the commission should not have used "double leverage" to determine a proper rate of return, especially since in doing so the commission applied the DCF method. But double leverage was approved in *United Tel. Co. of Iowa*, supra. Contrary to the company's argument, the commission could believe it was appropriate to apply the DCF method in its application of double leverage.

The company advances a second reason why it believes the commission improperly used the DCF method in applying double leverage. It contends that, instead of adjusting GTE's financial picture (due to the drag on earnings by Sylvania), the commission should have compared GTE to other similar companies. It is true that imprecise calculations are used when rate of return is established by the "double leverage" method. But we think the company's suggestion would call for even less precision. It must be remembered that the determination sought is a rate of return, not for GTE, but for the company.

We believe and hold the company has failed in its challenge to the commission's determination of the proper rate of return.

IV. In applying the rate-making equation (rate base $\times$ rate of return $=$ profit) the commission found that profits of the company during the test period should be increased because of the company's dealing with Directory Company, another GTE subsidiary. Directory Company, in addition to publishing telephone directories for the company, also sells advertising in the directories. The commission determined that Directory Company collected unreasonable profits from the company. Accordingly, the amount of unreasonable profits were added to the income generated for the company through the sale of advertisements in the directories. Again the commission used the cost standard to determine the reasonableness of the profits and a rate base $\times$ rate of return $=$ income analysis.

The company argued, as it had in connection with Automatic, that a profit-per-sale method be used. The commission again rejected the argument. Under our standard of review, previously outlined, we find the company has failed in its challenge to this determination.

V. Bearing in mind that the burden of proof was upon the company, we cannot say that the actions of the commission in any way violated § 17A.19(8), The Code. The claim of an unconstitutional taking of property is derivative of the claim that the methods employed by the commission were unreasonable. We have found they were not.

There was substantial evidence for the commission's findings. Evidence is substantial when ". . . a reasonable mind would accept it as adequate to reach a conclusion. . . ." *City of Davenport v. Pub. Emp. Rel. Bd.*, 264 N.W.2d 307, 311 (Iowa 1978).

The trial court was in error in reversing the commission. We therefore reverse the trial court and remand the case for an order reinstating the decision of the commission.

REVERSED AND REMANDED.

All Justices concur, except REYNOLDSON, C. J., and ALLBEE, J., who take no part.