712 P.2d 643

**GENERAL TELEPHONE COMPANY OF THE NORTHWEST, INC., Appellant,**

v.

**IDAHO PUBLIC UTILITIES COMMISSION, Respondent.**

No. 15275.

Supreme Court of Idaho.

Jan. 9, 1986.

Karl M. Shurtliff, Boise, L. Russell Mitten, II and William C. Fleming, Everett, Wash., for appellant.

Jim Jones, Atty. Gen., State, John J. McMahon, Chief Deputy Atty. Gen., State, and Michael S. Gilmore, Deputy Atty. Gen., State, for respondent.

HUNTLEY, Justice.

This is an appeal from an order of the Idaho Public Utilities Commission granting General Telephone Company of the Northwest a rate increase but in an amount less than that requested by the utility company. *Affirmed.*

On November 5, 1982, appellant General Telephone of the Northwest, Inc. ("GTNW" or "the company") filed an application with the Idaho Public Utilities Commission, seeking approval to raise its rates to Idaho customers by 19%. Public hearings were held on the proposed rates. On August 8, 1983, the commission rejected the filed request for additional revenues of $4,941,570 but allowed an increase of $1,026,598. GTNW appeals, alleging that the commission erred in evaluating the company's capital structure and income tax expense, and in adjusting downward the rates allowable for advertising costs paid by GTNW to its sister corporation, General Telephone Directories Company. We affirm the commission's decision.

I. Imputation of holding company's capital structure to the subsidiary, GTNW.

Appellant GTNW is a wholly-owned subsidiary of General Telephone and Electronics Corporation (GTE), a utility holding

company. Accordingly, GTNW's stock is not publicly sold; instead, GTE Corporation provides all of GTNW's equity capital. Furthermore, GTNW does not file its own federal income tax return, but participates in a consolidated return with GTE and GTE's other subsidiaries.

In determining the rate increase allowable to GTNW, the commission took into consideration this relationship between GTNW and GTE, and the commission imputed the capital structure of the holding company into the appellant operating company. The commission stated:

"GTNW can select a capital structure with any ratios of debt and equity capital that, in the sole discretion of management, it finds desirable. The Company could select a capital structure with either 100% debt or 100% equity to finance its capital requirements. The Commission's duty in all instances is to evaluate the capital structure selected by the utility, ascertain what a reasonable capital structure would be given the utility's risks and the ratepayers' reasonable interest, and determine a fair rate of return on that capital structure. *Idaho Code,* §§ 61-301, -315 and -502. This is precisely the process followed by the Commission [here].

\* \* \* \* \* \*

"The underlying conflict between the approach adopted by the Commission and that recommended by GTNW is the percentage of common equity allowed in the capital structure. The imputed approach ... *lowers* the percentage of common equity to 35.65% because it attributes a portion of GTNW's common equity to the preferred stock and debt of GTE Corporation. The actual capital structure proposed by GTNW attributes 48.03% to common equity. Because equity capital generates more revenue than debt capital, GTNW objects to the Commission's use of an imputed capital structure with a lower percentage of equity than that in the subsidiary's actual capital structure."

The commission concluded:

"We adopt the imputed capital structure proposed by Commission Staff witness

... We have, on numerous occasions, adopted capital structures other than the actual capital structures of utilities. We cannot ignore the fact that a portion of GTNW's common equity is financed by GTE Debt and Preferred Stock. Moreover, ... we (have) specifically required that the use of double leveraging be addressed in this rate case."

We note at the outset that the commission has broad discretion in designing rates chargeable by utilities to their customers. "If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry ... is at an end." *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944). *See also,* Idaho Const. art. 5, § 9; I.C. § 61-629; *Utah Power & Light Co. v. Idaho Pub. Util. Comm'n,* 102 Idaho 282, 629 P.2d 678 (1981); *Grindstone Butte Mut. Canal Co. v. Idaho Pub. Util. Com.,* 102 Idaho 175, 627 P.2d 804 (1981). We have formerly held that the only question presented to us when the commission adopts a hypothetical capital structure is whether, under the circumstances of the case, the commission has abused its discretion. *Citizens Util. Co. v. Idaho Pub. Util. Com.,* 99 Idaho 164, 174, 579 P.2d 110, 120 (1978); *Petition of Mountain States Telephone & Tel. Co.,* 76 Idaho 474, 284 P.2d 681 (1955).

Courts which have reviewed the imputed capital approach, in calculating the rate of return for a wholly-owned subsidiary of a holding company, have largely accepted it. *See generally Communications Satellite Corp. v. F.C.C.,* 611 F.2d 883 (D.C.Cir. 1977), wherein the court stated:

"The FCC cannot be faulted for considering consumer interests in the COMSAT proceeding, and deciding that COMSAT could reasonably have levered its capital structure with debt. In so doing, it not only was true to its statutory obligation, but was also following a practice quite commonplace among public commissions charged with reviewing and setting rea-

sonable rates for service. The practice of imputing a hypothetical amount of debt has been explicitly approved by the public utility commissions or courts of at least twenty-two states and the District of Columbia. Over the course of the last two decades, the following jurisdictions have hypothetically altered the actual capital structure of a regulated corporation for purposes of setting rates that were more equitable to consumers: Alabama, Connecticut, Delaware, District of Columbia, Idaho, Illinois, Louisiana, Maryland, Massachusetts, Michigan, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, Pennsylvania, South Dakota, Tennessee, Texas, Utah, Vermont, Washington, and Wyoming. Minnesota and California have expressed some reservation to imputing a hypothetical amount of debt when the regulated company's outstanding debt was 'not improper.' But the term 'improper' could have referred to the perspective of a rate-payer, in which case those courts would not be in disagreement with the others cited." (Footnotes containing case citations omitted.) 611 F.2d at 904–905).

*See also General Tel. Co. v. Ark. Public Service Com.,* 272 Ark. 440, 616 S.W.2d 1 (1981); *Gen. Tel., Etc. v. Iowa State Commerce Com.,* 275 N.W.2d 364 (Iowa 1979); *So. Cent. Bell Tel. v. La. Public Service Com'n,* 352 So.2d 964 (La.1977), *cert. denied,* 437 U.S. 911, 98 S.Ct. 3103, 57 L.Ed.2d 1142 (1978); *New England Tel. & Tel. Co. v. Public Utilities Com.,* 448 A.2d 272 (Me.1982); *Potomac Edison Co. v. Public Service Com.,* 279 Md. 573, 369 A.2d 1035 (1977); *Southern Bell Tel. & Tel. Co. v. Mississippi Public Service Com.,* 237 Miss. 157, 113 So.2d 622 (1959); *Mountain States, Tel. & Tel. Co. v. Dept. of Public Service Regulation,* 624 P.2d 481 (Mont.1981); *Re Application of General Tel. Co. of Southwest,* 98 N.M. 749, 652 P.2d 1200 (1982); *Spring Valley Water Co. v. Public Service Com.,* 71 A.D.2d 55, 422 N.Y.S.2d 155 (1979); *Ohio Suburban Water Co. v. Public Utilities Com.,* 62 Ohio St.2d 17, 402 N.E.2d 539 (Ohio), *cert. de-*

*nied,* 449 U.S. 876, 101 S.Ct. 219, 66 L.Ed.2d 97 (1980); *New England Tel. & Tel. Co. v. Public Utilities Com.,* 459 A.2d 1381 (R.I.1983); *General Tel. Co. v. Public Utility Com'n,* 628 S.W.2d 832 (Tex.App. 1982); *Central Tel. Co. v. State Corp. Com.,* 219 Va. 863, 252 S.E.2d 575 (1979).

GTNW asserts that the commission's use of an imputed capital structure denies the company equal protection, because a company which was not a wholly-owned subsidiary but was otherwise similarly situated to GTNW would have been allowed a higher rate of return upon the evidence presented. Assuming the truth of GTNW's allegation, the question becomes whether the distinction between wholly-owned subsidiaries and non-subsidiaries, for ratesetting purposes, is a valid one. We hold that it is, and we therefore find no denial by the commission of GTNW's right to equal protection under the law.

The mere fact of different treatment does not necessarily violate the equal protection clause of either the fifth or fourteenth amendment to the United States Constitution or article I, § 2 of the Idaho Constitution.

We note first that the ratesetting order herein is reviewed in the same manner as a challenged statute would be reviewed by this Court, because ratesetting is a legislative function delegated to the Public Utilities Commission by the legislature. The commission's authority derives from enabling statutes; it exercises limited jurisdiction, and nothing is presumed in favor of its jurisdiction. *Idaho State Homebuilders v. Washington Water Power,* 107 Idaho 415, 690 P.2d 350 (1984); *Petition of Mountain States Tel. & Tel. Co.,* 76 Idaho 474, 284 P.2d 681 (1955); *Idaho Power & Light Co. v. Blomquist,* 26 Idaho 222, 141 P. 1083 (1914).

In *Jones v. State Bd. of Medicine,* 97 Idaho 859, 555 P.2d 399 (1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977), this Court reviewed traditional equal protection analysis. We stated:

"If the classification [of persons to whom the statute applies] involves a fundamental right or a suspect classification such as race, the state bears a heavy burden to justify the classification by a compelling state interest. That has been termed the strict scrutiny test.

"In other classifications, particularly in the areas of social welfare legislation, a restrained standard of review is applied. Such standard is set forth in *McGowan v. Maryland,* 366 U.S. 420, 425–426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961):

'The constitutional safeguard [of equal protection] is offended only if the classification rests on grounds wholly irrelevant to the achievement of the state's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their law results in some inequality. A statutory discrimination will not be set aside if any statement of facts may be reasonably conceived to justify it.'

\* \* \* \* \* \*

"However, the opinions of the United State [sic] Supreme Court in *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), and *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), would seem to declare a new category of inequity as to questions of equal protection. [Citations.]

\* \* \* \* \* \*

"The standard set forth in *Reed* focuses upon the relationship between the subject legislation and the object or purpose to be served thereby. This new intermediate standard of equal protection review has been described as 'means-focus' because it tests whether the legislative means substantially furthers some specifically identifiable legislative end.

\* \* \* \* \* \*

"[W]ith respect to certain statutes which create obviously discriminatory classifications, this Court will examine the means by which those classifications are utilized and implemented in light of the asserted legislative purpose. However, the burden of showing the absence of a reasonable relationship under the means-focus test remains with the one who assails the classification. [Citations.]" 97 Idaho at 866–867, 555 P.2d at 406–407.

In *Leliefeld v. Johnson,* 104 Idaho 357, 659 P.2d 111 (1983), we commented on the *Jones* holding as follows:

"The opinion in *Jones* explains that the 'means-focus' standard is to be applied when a two-part trigger has been satisfied. The statute must be discriminatory on its face and there must be '*a patent indication of a lack of relationship between the classification and the declared purpose* of the statute ...' [Citations.]" (Emphasis added.) 104 Idaho at 374, 659 P.2d at 128:

In the present case, GTNW does not assert, nor do we perceive, that a "fundamental right" is implicated by the commission's rate-setting order, such as would trigger a strict scrutiny treatment of the equal protection violations asserted herein. The appropriate standard of review, under the language of *Jones* and *Leliefield,* would seem to be that applicable to economic legislation, that being the rational basis test of *McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393, (1961), and *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). We deem that the order here involved, imputing the capital structure of the holding company into the subsidiary GTNW, easily passes the rational basis test.

The stock of GTNW is held solely by its parent GTE. GTNW urges that the commission should have ignored this fact and looked only to the actual capital structure of GTNW, thus treating it as it would treat a publicly-owned facility. However, the commission reasonably and correctly noted that GTNW is not comparable to a publicly-held company. The capital structure of GTNW is totally manipulated by its parent, GTE. GTNW is easily distinguished, in its financial structure, from non-subsidiaries.

The imputation of the parent's capital structure to GTNW "recognizes [that] the financing of equity for a subsidiary does not result from the impersonal forces of the financial market [as it does in the case of a publicly-held company,] but rather from boardroom decisions made by a parent corporation which controls, to a great extent, the ultimate cost of a subsidiary's equity." *General Tel. Co. v. Public Utility Com.*, 628 S.W.2d 832, 838 (Tex.App. 1982). It is clear that the commission's classification of companies, between wholly-owned subsidiaries and publicly-held facilities, advances the legitimate goal of achieving telephone rates that fairly and reasonably reflect the company's cost and risk of doing business, allowing GTNW a fair return on its investments and those of its parent, while not imposing upon Idaho consumers unreasonably high costs for their telephone services. The "rational basis" requirements are easily satisfied here. We therefore affirm the holding of the Public Utilities Commission, that no equal protection violation has occurred.[1]

■ GTNW next asserts that the commission's adoption of an imputed capital structure denies the company due process and is confiscatory. We disagree. We note first that the imputed capital structure, as above-documented, is common and accepted ratesetting practice. Furthermore, the commission's decision in this regard is based on substantial, competent evidence in the form of lengthy testimony from staff witness Johnson. Although this testimony was in turn controverted by the expert witnesses presented by the company, we defer to the commission's interpretation of, and judgment as to the credibility of, the evidence before it. *Grindstone Butte Mut. Canal Co. v. Idaho Public*

*Utilities Com.*, 102 Idaho 175, 627 P.2d 804 (1981); I.C. § 61–629.

■ The company asserts that the commission's imputation to GTNW of GTE's capital structure constitutes improper substitution of the commission's judgment for that of the company's directors as to what the company's capital structure should be. We disagree. The commission here is not telling the company to change its capital structure. Rather, the commission is merely recognizing the existence of the holding company arrangement, for purposes of setting rates. The United States Court of Appeals explained, in *Communications Satellite Corp. v. Federal Communications Com.*, 611 F.2d 883 (D.C.Cir.1977):

"[I]t is well settled in public utility law that it is no interference with this management prerogative for a regulatory commission to impute a hypothetical capital structure, whether or not the regulated company increases its debt; for that is done merely in pursuance of the Commission's legitimate rate-making authority.

"One of the clearest statements of this principle is afforded by the Supreme Court of New Hampshire, in *New England Telephone & Telegraph Co. v. State*, 98 N.H. 211, 220, 97 A.2d 213, 220 (1953):

"Although the determination of whether bonds or stocks should be issued is for management, the matter of debt ratio is not exclusively within its province. Debt ratio substantially affects the manner and cost of obtaining new capital. It is therefore an important factor in the rate of return and must necessarily be considered by and come within the authority of the body

---

1. The commission noted in its order that, in practice, it does not mechanically apply either an *imputed* capital structure or an *actual* capital structure, when setting rates for subsidiaries of holding companies, but "[r]ather, on a case by case basis, the Commission evaluates the reasonableness of the capital structure of the subsidiary *vis-a-vis* that of the parent." The commission further stated:

"[O]n numerous occasions the Commission imputes a capital structure to a utility after determining that the actual capital structure is not in the public interest. It should also be stressed that utilities themselves frequently request such treatment when short-term market aberrations distort the actual capital structure and make it veer significantly from the Company's 'target' or ideal capital structure."

charged by law with the duty of fixing a just and reasonable rate of return.

"The same sentiment has been echoed by the Federal Communications Commission itself in a rate determination opinion:

"We do not propose to require RCAC or any other carrier to incur any particular percentage of debt in meeting its capital requirements. However, it appears to us that in fixing a rate of return we must keep in mind the capital structure which a regulated carrier chooses to maintain in order to balance properly the requirements of safety of investment, stability of dividends, and availability of capital, and an obligation to maintain that rate structure which will, consistent with the foregoing, result in minimum requirements from the rate-paying public.

*Re Western Union Telegraph Co.*, 25 F.C.C. 535, 600–01, 25 PUR3d 385, 464–65 (1958). Many state public utility commissions have also followed this method of imputing a hypothetical amount of debt. For example, the Idaho Public Utilities Commission has stated:

"The function of this commission is regulatory and not managerial. The determination of debt-equity ratios of capital is for management, but when a policy adopted by management results in the payment by subscribers of rates higher than might be required under another policy available to management, then this commission must take note.

*Re Mountain States Telephone & Telegraph Co.*, 6 PUR3d 428, 438 (Idaho Pub. Util. Comm'n (1954). The Public Service Commissions of Louisiana and Wyoming are on record to the same effect. See *Louisiana Public Service Commission v. Southern Bell Telephone & Telegraph Co.*, 14 PUR3d 146, 165 (La.Pub.Serv.Comm'n 1956); *Re Mountain States Telephone & Telegraph Co.*, 14 PUR3d 231, 237 (Wyo. Pub.Serv.Comm'n 1956).

"Perhaps the ultimate authority for imputing debt when necessary to protect ratepayers from excessive capital charges is the Supreme Court's statement in Hope Natural Gas, that 'The rate-making process under the Act, i.e., the fixing of "just and reasonable" rates, involves a balancing of the investor and the consumer interests.' 320 U.S. at 603, 64 S.Ct. at 288. The equity investor's stake is made less secure as the company's debt rises, but the consumer ratepayer's burden is alleviated. It is these conflicting interests that the Commission is to reconcile."

*Accord General Tel. Co. v. Public Utility Com.*, 628 S.W.2d 832, 837 (Tex.App.1982); *Southern Bell Tel. & Tel. Co. v. Mississippi Public Service Com.*, 237 Miss. 157, 113 So.2d 622 (1959).

GTNW asserts that the overall effect of the commission's order herein is to deny the company due process by setting arbitrarily and unlawfully low rates. GTNW argues that the 14.1% rate of return on common equity, granted by the commission to the company, is so low as to be confiscatory. The commission based this rate of return on the calculations of the commission's staff witness Johnson, while rejecting the testimony of the company's experts. The commission gave its reasons for not adopting the company's calculations of the returns to which GTNW was entitled, noting changes in current economic conditions; substantial decline in rates of inflation and prime interest; and recent actions of the Federal Communications Commission affecting telephone companies.

We have reviewed the testimony presented to the commission. We find the commission's decision, awarding 14.1% return on equity, to be reasonable and well-supported by the record, under the standards of *Bluefield Water Works & Improvement Co. v. Public Service Com.*, 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923) (a utility is entitled to earn a return on the value of the property which it employs for the convenience of the public, equal to the return being made at the same time and in the same general part of the country on busi-

ness undertakings which are attended by corresponding risk and uncertainty). *Accord Federal Power Com. v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944); *Utah Power & Light Co. v. Idaho Public Utilities Com.*, 105 Idaho 822, 673 P.2d 422 (1983).

### II. Imputation of holding company's debt expense to the subsidiary, GTNW.

■ Appellant GTNW next contends that the commission erred in imputing to GTNW certain tax benefits available to the holding company, GTE. We do not find error in this regard. We have already held that the commission may consider the capital costs and structure of a holding company in determining appropriate rates chargeable by a wholly-owned subsidiary. It follows that the commission may consider, as well, the holding company's outstanding debts, expenses of maintaining such debts, and tax advantages arising from interest payments made. The commission correctly held that Idaho ratepayers were entitled to share in the tax deductions resulting from GTE's debts which they indirectly finance.

It is undisputed that GTNW does not file a separate income tax return but participates in a consolidated return for GTE and GTE's other subsidiaries. The commission reasonably assigned a proportionate share of GTE's income tax deductions to GTNW's capital structure, stating:

> "Removal of this adjustment would increase GTNW's Idaho revenue requirement by approximately $694,000 ... The amount of tax benefits available to GTNW is controlled by GTE Corporation, not this Commission. The federal income tax return filed for GTNW is filed by GTE Corporation and the resulting benefits are flowed from GTE to GTNW. Any quarrel GTNW has with this procedure lies beyond the scope of this Commission."

Appellant argues that the effect of this adjustment was to flow through to ratepayers certain tax benefits not actually available to the subsidiary company. Again, we note that the commission did not order the company not to file a consolidated tax return, but rather recognized, for ratesetting purposes, that by using the consolidated form, GTNW's parent, GTE Corporation, was able to realize certain advantages which should be shared with GTNW's paying customers.

Imputation of certain tax benefits is not new to ratesetting proceedings. *See General Tel. Co. v. Public Utility Com.*, 628 S.W.2d 832, 840 (Tex.App.1982); *Spring Valley Water Co. v. Public Serv. Com.*, 71 A.D.2d 55, 422 N.Y.S.2d 155 (1979). · *See also Consolidated Gas Supply Corp. v. Federal Energy Regulatory Com.*, 653 F.2d 129 (4th Cir.1981) (since customers pay the cost of debt, gains realized in repurchasing the debt should be passed on to them). In *New England Tel. & Tel. Co. v. Public Utilities Com.*, 390 A.2d 8, 27, fn. 14 (Me.1978), the Court gave the following pertinent justification for imputing certain of the holding company's tax breaks to its subsidiaries, which joined the parent company in a consolidated tax return:

> "At this point we must note that we would not approve the Commission's 'tracing' of debt expense through two corporate structures if New England had not filed a consolidated return with American Telephone & Telegraph. We view the interest expense allocation in this case as a reasonable method to distribute tax savings occasioned by the filing of a consolidated federal income tax return and not as an outgrowth of the Commission's double leverage adjustment.
>
> "If New England and American Telephone & Telegraph had filed separate returns the Commission could not reduce New England's federal income tax expense by allocating American Telephone & Telegraph's debt expense, because New England would be entitled to recover all legitimate federal taxes which it must pay. But where the companies file a consolidated return, we have no such concern because they have chosen to be treated as a single entity for tax pur-

poses, including consolidation of taxable incomes and allocation of tax savings. See *Federal Power Commission v. United Gas Pipe Line Co.*, supra, 386 U.S. [237] at 243, 87 S.Ct. 1003 [at 1007, 18 L.Ed.2d 18]."

That portion of the commission's order, assigning a proportionate share of GTE's tax return benefits to GTNW, is affirmed.

### III. Reduction of directory advertising costs.

Finally, GTNW asserts that the commission erred in disallowing a portion of the payments made by GTNW to GTE Directories Corporation. GTE Directories Corporation, like GTNW, is a wholly owned subsidiary of GTE Corporation. The contract between GTNW and the GTE Directories Company provides that the Directories Company will be GTNW's, exclusive agent responsible for the sale of yellow page advertising, the compilation of the alphabetical and classified sections of the directory, and publication and shipment of the directories to the local exchanges. GTNW assumes some, but not all, of the costs; and GTNW retains 54% of the revenues therefrom after certain adjustments.

■ In essence, the commission held that the circumstances demonstrated an affiliate transaction, and that the burden of proving the reasonableness of the charges therefore fell upon the utility, citing *Boise Water Corp. v. Idaho Public Utilities Com.*, 97 Idaho 832, 836–837, 555 P.2d 163, 167–168. We agreewith the commission that the circumstances demonstrate an affiliate transaction and that the rule announced in *Boise Water, supra,* applies. As we stated in *Boise Water:*

"Although the Company may have established actual incurrence of these operating expenses, that fact alone does not establish a prima facie case of reasonableness with respect to payments to affiliates. [Citations.]

'Charges arising out of intercompany relationships between affiliated compa-

nies should be scrutinized with care . . .

\* \* \* \* \* \*

'The desire of public utility management, evidenced by various methods, to secure the highest possible return to the ultimate owners is incompatible with the semi-public nature of the utility business, which the management directs. It therefore follows that the commission should scrutinize carefully charges by affiliates, as inflated charges to operating company may be a means to improperly increase the allowable revenue and raise the cost to consumers of utility service as well as the unwarranted source of profit to the ultimate holding company.' "

■ GTNW does not direct the Court to any evidence in the record demonstrating the reasonableness of the amount of its payments to GTE Directories Company. Rather it asserts that since GTNW and GTE Directories are both subsidiaries of GTE Corporation, neither is a subsidiary of the other. Instead, they are sister corporations. If a distinction exists, it is a distinction without a difference. We hold that GTNW has not sustained its burden of proving the reasonableness of its payments to GTE Directories, and that the commission did not err in disallowing inclusion of those costs in the rate base.

The commission found that GTE Directories Company obtained a return of 36.8% in 1980, 19.9% in 1981, and 33.6% in 1982, on GTE Directories' invested capital. The commission held that the amount of GTNW's payments to GTE Directories Company should be limited to an amount which would reflect a return of 11.9% on GTE Directories' investment, which amount corresponds to the rate of return allowed to GTNW. Hence, the commission utilized the "California approach" rather than the "traditional" approach to an affiliate transaction. *See, Washington Water Power v. Idaho Public Utilities Com.*, 101 Idaho 567, 617 P.2d 1242 (1980) (*WWP I*), and *Washington Water Power v. Idaho*

*Public Utilities Com.*, 105 Idaho 276, 668 P.2d 1007 (1983) (*WWP II*).

The commission's analysis is correct under the circumstances presented herein and its finding as to the amount of payments to GTE Directories to be allowed for rate-making purposes is supported by substantial competent evidence.

The order of the commission is affirmed. Costs to respondent. No attorney fees awarded.

DONALDSON, C.J., and BISTLINE, J., concur.

SHEPARD, Justice, dissenting.

I cannot join in that portion of Section III of the majority's opinion which affirms the commission's utilization of the "California" approach. I believe the commission erred in not utilizing the traditional approach to an affiliate transaction. In the instant case we must determine whether once a utility has failed to carry its burden of proof of the reasonableness of charges paid to an affiliate, the commission may refuse to make further inquiry as to comparable pricing between independent parties and revert to the California approach, allowing only such charge to the affiliate as would generate the same rate of return as that allowed to the utility company itself.

I do not endorse the California approach. As enunciated in the special concurring opinion of Bakes, J. in *Washington Water Power v. Idaho Public Util.*, 105 Idaho 276, 668 P.2d 1007 (1983) (*WWP II*), "the commission cannot arbitrarily assign a rate of return to the subsidiary that has previously been determined as reasonable only for the parent utility which has entirely different costs and risks." 105 Idaho at 285, 668 P.2d 1007. The California approach blatantly ignores the difference in risks between public utilities which are guaranteed a profit, and private businesses which are not guaranteed anything. Even assuming that *cost* may be ignored and that the commission is entitled to look at the rate of return, as the Louisiana court stated, "... the fair rate of return of the

subsidiary and not that of the parent should be the touchstone for determining if the subsidiary's profits are unreasonable and for making any indicated adjustments." *Central Louisiana Electric Co. v. Louisiana Public Service*, 373 So.2d 123 (La.1979). The California approach ignores whether the costs charged under the contract are fair as compared to what similarly situated businesses charge for the same service.

The commission may be free to refuse to accept the actual charge paid the affiliate for inclusion in the rate base. However, the commission must articulate a reasoned approach in arriving at an allowable cost to be included in the rate base. These costs must be founded upon either evidence of the costs of such services in the competitive market between non-affiliated companies, or, in the alternative, evidence of reasonable rates of return earned by non-affiliate companies providing like services as supplied by GTE Directories Company.

The California approach has not been utilized except by a very few cases which involve the Bell Telephone System and its manufacturing subsidiaries. Moreover, these cases were all decided prior to the breakup of the Bell System. *See Montana-Dakota Utilities Co. v. Bollinger*, 632 P.2d 1086 (Mont.1981); *Application of Montana-Dakota Utilities*, 278 N.W.2d 189 (S.D.1979); *Central Louisiana Electric Co. v. Louisiana Public Service Comm'n.*, 373 So.2d 123 (La.1979).

As Bakes, J. pointed out in *WWP II:* "Any approach that allows the commission to reject summarily evidence presented on the reasonableness of a price paid for a commodity and allows the commission to arbitrarily set a rate of return without inquiry into the reasonableness of that rate of return for the particular company under consideration, is arbitrary and unreasonable and by our opinion today has been rejected." (Citations omitted.) 105 Idaho 298, 668 P.2d 1007.

The commission's action in the instant case is illustrative of the arbitrariness of the

**952**

California approach which, under the guise of regulating public utilities, succeeds in regulating private businesses which are not subject to the jurisdiction of the commission. I therefore dissent from the majority's endorsement of the California approach to an affiliate transaction.

BAKES, J., concurs.